Freddie Lee BENNETT, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

Oct. 27, 1975.

Rehearing Denied Dec. 1, 1975.

Robert M. Stivers, Jr., Ronald E. Hedges, Knoxville, for petitioner.

R. A. Ashley, Jr., Atty. Gen., Bart Durham, Asst. Atty. Gen., Ronald A. Webster, Dist. Atty. Gen., Ralph E. Harwell, John T. O'Connor, Asst. Dist. Attys. Gen., for respondent.

## OPINION

We granted certiorari in this case to examine so much of the record as touches upon the petitioner's complaint that the in-court identification made by the prosecutrix was tainted by suggestive practices of the Knoxville Police Department prior to a line-up identification.

The Court of Criminal Appeals upheld the action of the trial judge in holding that the identification was not so tainted.

## I.

Defendant was convicted of armed robbery and rape. While the record contains ample corroboration of the commission of these offenses, the identity of the defendant was essentially established by the testimony of the prosecutrix. The factual situation must be fully considered since it throws substantial light upon the ability of the prosecutrix to identify the defendant.

At about 10:00 o'clock, P.M. on Friday, July 13, 1973, the prosecutrix, an unmarried female, accompanied by her two small children, the eldest of whom was under four years of age, and by a male companion, Willard Sturch, checked into room 9 of the Magnolia Hotel in Knoxville. What ensued for the next two or three hours, after the children were tucked safely into one of the two double beds, is of no significance and certainly would not be startling under prevailing conditions. Among other things, after they had checked into the motel she had one drink and Sturch had several.

In due course, and while Sturch was stretched out on another bed sleeping the

sleep of the just after, and while the prosecutrix was lying on her bed nude, but modestly covered by a sheet, looking at television, the defendant entered the room, carrying a pistol. There ensued some conversation during which she inquired whether he was in the right room. He made known that robbery was his motive, told her to be quiet and she told him where to find her own money and that of her sleeping companion. He instructed her to close her eyes and she complied, but "peeped" occasionally. The record fairly establishes that she had her eyes closed much, if not most of the time. During the entire course of events the large color television set was in operation and a bathroom light was shining through the open bathroom door. There is no doubt but that these two sources created ample illumination to enable a person with normal vision to identify another person walking about the room.

It is her testimony that he rambled about the room for some thirty to forty-five minutes, during which time he removed her money from her purse and took the wallet and certain other valuables from her companion's trousers. At all times he held on to his gun and occasionally would speak to her. Finally, he came to her bed, partially removed the sheet, pointed the gun at the head of her small child who had come over to her bed prior to defendant's entry upon the scene, threatened to kill both the child and her, and committed the act of rape. This only lasted a matter of seconds since the initial penetration was accomplished with such gusto that the bed shook and vibrated causing Sturch to arouse. Whereupon, defendant shot him, and fled the room.

It should be pointed out that Sturch left the jurisdiction, could not be located, and, therefore, did not testify.

One week later, on July 20, 1973, late in the nighttime, the defendant was apprehended attempting to enter Room 10 of the same motel, and was taken into custody.

On 23 July 1973, the prosecutrix was called to the Detective Division at the Police Station. At this time she was shown a single photograph of the defendant and was told by a captain of the Knoxville Police Department that "he had a picture of the suspect that he had picked up", and was asked "if that could possibly be him". Her response was: "I told him it was him, that was the man". She emphatically denies, as do the police officers, that she was ever told that this was the man who committed the crimes—merely that he was a suspect. She was not told that he would shortly appear in a line-up.

Immediately after this identification she was taken to a line-up where the defendant and four other individuals appeared. She positively identified the defendant.

It should be pointed out that on the night of the incident she gave the investigating officers a full and accurate description of the defendant's attire and physical characteristics. She told them at that time that she had gotten a good look at him. They checked the lighting condition of the room and confirmed her ability to see and identify an assailant. It should also be noted that there was an apparent effort on the part of the defendant to alter his appearance. On the night of the crime he was smoothly shaven; by the time of the line-up, he had started growing a mustache and chin whiskers. By the time of the preliminary hearing he had grown a mustache.

Essentially this is the factual background as reflected by evidence which stands accredited and validated by the jury verdict. We now examine the applicable law.

II.

The controlling law is of comparatively recent vintage. Prior to 1967 the manner in which a line-up was conducted or an extra-judicial identification was made went to the weight of the testimony and not its admissibility upon the trial. In a trilogy of cases decided by the Supreme Court of the

United States in June, 1967, the Court dealt with post-indictment line-up procedures.

In the first of these, *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Court held that a post-indictment line-up is a critical stage of a prosecution at which the defendant is entitled to be represented by counsel. While *Wade* does not deal with an identification allegedly tainted by the use of a photograph prior to the line-up, the Court recognizes the potential for abuse and points out that the line-up confrontations are "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial". The Court aptly points out that:

> A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. 388 U.S. at 228, 87 S.Ct. at 1933.

In the second case, *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the Court dealt with a line-up conducted sixteen days after indictment and after the appointment of counsel. Again photographs exhibited to a witness prior to the line-up were not involved. Again the Court held that a post-indictment pretrial line-up is a critical stage of a criminal prosecution and that conducting such a line-up in the absence of the defendant's counsel, denies the accused his Sixth Amendment right to counsel, and calls into question the admissibility of the in-court identification. The court vacated the judgment of conviction pending the establishment by the State of California that the in-court identification had an independent source, or that the introduction of such identification was harmless error.

The third case, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), reaffirms the holding of *Wade* and *Gilbert*, and reiterates the prohibition against exhibiting an accused in a line-up, for identification purposes without notice to and in the absence of counsel. *Stovall* announces a rule of law that:

> [a] claimed violation of due process of law in the conduct of a confrontation depends upon the totality of the circumstances surrounding it . . .. 388 U.S. at 302, 87 S.Ct. at 1972.

The "totality of the circumstances" rule of *Stovall* was reaffirmed in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In this case snapshots of the accused were shown to five bank employees who had witnessed the robbery. The insistence was made that this pretrial identification by means of photographs was so unnecessarily suggestive and conducive to misidentification as to constitute a denial of due process of law. In discussing the hazards of initial identification by photographs the Court said:

> It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witnesses only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person ac-

tually seen, reducing the trustworthiness of the subsequent line-up or courtroom identification. 390 U.S. 383, 384, 88 S.Ct. at 971.

Notwithstanding the inherent dangers in the use of photograph identification, the Court recognizes that this procedure "has been used widely and effectively in criminal law enforcement, from the standpoint of both apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eye-witnesses to exonerate them through scrutiny of photographs". In conclusion the Court said:

> We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. 390 U.S. at 384, 88 S.Ct. at 971.

The case of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), is analogous to the case under consideration. *Biggers* was convicted of rape and the Tennessee Supreme Court [1] upheld that conviction in the face of an attack upon the show-up identification procedure. He petitioned for the writ of habeas corpus and the United States District Court for the Middle District of Tennessee held that the show-up identification procedure was so suggestive as to violate due process. The Sixth Circuit affirmed (448 F.2d 91). On certiorari the Supreme Court reversed and remanded. With respect to the ability of the victim to recognize and identify her assailant the Court said:

> The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate

artificial light in her house and under a full moon outdoors and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough. She had 'no doubt' that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation.

In disagreeing with the conclusions of the District Court, the Supreme Court held that the factors to be considered in evaluating the likelihood of misidentification include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

### III.

The victim's degree of attention was adequate. The defendant was in her room for a period estimated from thirty to forty-five minutes and while during much if not most of this time she had her eyes closed, it is evident that she "peeped" or looked from time to time and that she had sufficient opportunity to see and observe him and that she availed herself of that opportunity. Moreover, as pointed out by the Court in *Biggers*, "she was no casual observer, but rather the victim of one of the most personally humiliating of all crimes". She testified positively that she got a good look at him.

1. *Biggers v. State*, 219 Tenn. 553, 411 S.W.2d 696 (1967).

Her description of the defendant was full and accurate. She identified the defendant in the line-up with certainty and "very shortly" and as soon as the line-up procedures had been completed.

The crime was committed on July 14, 1973; the line-up was conducted on July 23, 1973.

The identification procedure squares with the criteria established in *Neil v. Biggers, supra*, and under the "totality of the circumstances" rule, it is our view that the identification of the photograph prior to the line-up did not taint the identification made at the line-up and that neither tainted the in-court identification.

While we do not condemn the practice of using mug shots or other photographs during the course of the investigation of a criminal episode, we do not look with favor upon the practice of using such photographs immediately prior to a line-up or show-up. We think the practice under those circumstances is suggestive in that the likelihood of misidentification is increased. We think that the use of the photograph in this case, immediately prior to a line-up was improper and erroneous. However, we do not hold it offends constitutional due process. This conclusion must be dependent upon the totality of the circumstances and the application of the standards hereinabove set forth. In the "totality of the circumstances" concept, we have examined the record and find that there is substantial other testimony to validate the identification of the defendant as being the culprit who committed the crime of robbery and rape in this case. Among other things, we are persuaded by the fact that seven days after the commission of the offense here involved, the defendant was apprehended, late at night, on the same night of the week, at the same motel, attempting to enter an adjoining room while armed with a pistol of the same caliber used to inflict the wound upon the victim's companion.

■ We therefore hold that from the totality of the proof presented in this controversy, the in-court identification of the defendant was not tainted by the use of a photograph prior to the line-up, although we, in our supervisory capacity, caution against the use of photographs in general, and a single photograph in particular, immediately preceding a line-up or show-up. We adopt the rule of *Simmons* and *Biggers* as representing the applicable standards in this jurisdiction and under the due process requirements of the Constitution of the State of Tennessee.

The judgment of the Court of Criminal Appeals is

Affirmed.

FONES, C. J., COOPER and HARBISON, JJ., and INMAN, Special Justice, concur.

### ORDER DENYING PETITION TO REHEAR

HENRY, Justice.

The matter cited in the petition to rehear was considered along with all of the other facts and circumstances of this case, although it was not specifically commented upon in the Court's opinion. We are fully satisfied from a careful examination of the record and analysis of the proof presented that the petitioner was fully and fairly identified and that his ensuing conviction was fully supported by the evidence.

The petition to rehear is accordingly denied.