IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 2000 Session

## STATE OF TENNESSEE v. SAMUEL WAYNE LOVEDAY

**Direct Appeal from the Criminal Court for Knox County**
**No. 60107      Ray L. Jenkins, Judge**

_____

**No. E1999-01090-CCA-R3-CD**
**September 18, 2000**
_____

The defendant, who was convicted of attempted aggravated rape, aggravated sexual battery, and aggravated assault, appealed these convictions, presenting as issues whether the out-of-court showup identification of the defendant was impermissibly suggestive and whether the subsequent in-court identification was tainted as a result. Based upon our review, we conclude that these issues are without merit and, thus, affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. JOSEPH M. TIPTON, J., concurring in results only.

D. David Sexton, II (on appeal) and Thomas Slaughter (at trial), Knoxville, Tennessee, for the appellant, Samuel Wayne Loveday.

Paul G. Summers, Attorney General and Reporter; R. Stephen Jobe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Samuel Wayne Loveday, was convicted by a Knox County jury of attempted aggravated rape, aggravated sexual battery, and aggravated assault. The trial court sentenced the defendant as a Range I, standard offender to eleven years for the attempted aggravated rape, eleven years for the aggravated sexual battery, and five years for the aggravated assault, with all terms to be served concurrently.

In this appeal as of right, the defendant raises two, related, constitutional due process issues for our review:

I.   Whether the out-of-court showup identification of the defendant was impermissibly suggestive, and thus testimony concerning the identification itself should not have been admitted into evidence;

II.  Whether the in-court identification made by the victim was tainted by the showup and thus should not have been admitted into evidence.

The defendant did not file a motion to suppress the identification evidence, either as to the out-of-court showup or the in-court identification. Failure to raise these issues pretrial constitutes a waiver of his right to attack the identification evidence on appeal. See Tenn. R. Crim. P. 12(b)(3); see also State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993). We, nevertheless, elect to address the issues on the merits. Having reviewed the entire record and found no reversible error, we affirm the judgment of the trial court.

## FACTS

The evidence at trial showed that the defendant first approached the victim, Kelly Hatmaker, as she was walking alone in the early morning hours of June 15, 1995. Hatmaker had gone with Tony Frye and the couple's son, to the residence of a friend of Frye's in Christenberry Heights in Knoxville, for a cookout. At some point, Hatmaker and Frye engaged in an argument that led to Hatmaker's walking out of the house, in her sock feet, in search of a pay phone so that she could call her mother-in-law to come pick her up. While walking along Central Avenue near a railroad trestle, she saw an individual walking towards her. She crossed to the other side of the street to avoid the individual. As they passed, he called out, propositioning her. She responded that she was "not a prostitute" and kept walking. He also kept walking, but the victim then heard something and turned to see the individual running up behind her. At first he offered to help her, but once she dropped a rock that she was carrying to ward off dogs, he grabbed her by her ponytail and dragged her ten to fifteen feet down the railroad tracks. There were street lights in the area, so the victim was able to get a good look at the defendant's face.

The defendant slung the victim to the ground and told her he was going to have both vaginal and oral sex with her. She fought back and escaped, only to be run down and recaptured. Upon recapturing her, the defendant tried to place his penis in her mouth and told her, "I'm going to kill you, you bitch." The victim fought back again and managed to free herself. The defendant then picked up a piece of concrete and threw it at her, hitting her in the chest. The defendant again tried to put his penis in her mouth, but she kicked him in the groin and escaped. She ran screaming for help across a vacant lot to a nearby house. The whole encounter lasted some thirty to forty-five minutes. The victim testified that the defendant was wearing jeans and a very light blue T-shirt the night of the attack. She further testified that she was able to clearly see him several times during the attack because "[h]e was in my face a lot."

-2-

Carl Reynolds heard the victim screaming, "Help, help, he's gonna kill me; he's gonna kill me." Reynolds jumped out of his bed, looked out the window, and saw a female running across a vacant lot. Reynolds put on some clothes and then opened his door, telling the victim to get inside his gate. From his porch, Reynolds finally saw the individual that the victim kept pointing out, telling Reynolds, "There he is; there he is." Reynolds was not close enough to see the face of the man who was standing on the railroad track before the man turned and "took off in a fast haste, you know, walkin' fast." Reynolds did see that the individual was wearing jeans and a T-shirt.

Officer Ron Trentham with the Knoxville Police Department was among the four officers responding to a 911 dispatcher's alert to be on the lookout for a suspect in an attempted rape who was last seen near the tracks on Central Avenue around the Southern Foundry. Trentham and the other officers were given a general description of a white male with long brown hair, wearing a white shirt and blue jean pants who was intoxicated. For about an hour, the officers carried out a "grid search" of the area without finding anyone. Officer Trentham testified that the four officers had regrouped on Central Avenue to discuss where the suspect could have gone when a white male with long brown hair, wearing a white shirt and jeans, emerged from bushes growing against the wall of the Southern Foundry. He started running across the street with his head down. When he looked up and saw the police cars and the four officers standing there, he veered off to the left. Officer Trentham went after him and apprehended him, tackling him to the ground. In court, Officer Trentham identified the man he caught as the defendant. According to Trentham, "He had a strong odor of alcoholic beverage coming from his breath and his person. He had long, unkept [sic] hair. He was violent at the time of the arrest by elbowing and basically resisting, trying to get away from us." Furthermore, the defendant was dirty, "all of his clothes were dirty," and he was "real sweaty."

The officers put the defendant in handcuffs and placed him in the back seat of one of the police cars. Trentham testified further that the defendant was taken immediately to the hospital where the victim was being treated. The victim was brought out in a wheelchair to the carport of the emergency room of the hospital. Officer Trentham had the defendant step out of the police car, some six feet from the victim, and the victim did not hesitate in identifying the defendant as her attacker. This confrontation occurred within approximately two hours of the attack.

The defendant has a distinguishing physical characteristic, a harelip. According to the testimony of Tony Frye, who followed the ambulance that took the victim to the hospital, the victim told a police officer that her attacker had a harelip. The exchange at trial between Trentham and counsel for the defense fails to clarify whether it was Trentham whom the victim told about the harelip.[1]

---

[1]Defense counsel asked Officer Trentham if "Miss Loveday" ever mentioned the harelip, and Trentham answered, "Refused to speak to me." This response makes sense only if Trentham understood that he was being questioned concerning what the defendant, Loveday, said, not the victim, Hatmaker. This was, in fact, what he clarified on redirect, that is, that he had responded to defense counsel's question as it related to the defendant not the victim.

The defendant testified that he was not the perpetrator of the attack on the victim. He testified that on the day in question[2] he had gone directly from his job to the hospital to visit his terminally ill brother and be with his mother. He left the hospital around 7:30 p.m. and went with his brother-in-law and nephew to Jack's Bar which is located on Central Avenue, about two and a half blocks from where the attack took place. According to the defendant, he drank three or four beers and left the bar at approximately 9:30 p.m. He left the bar alone to walk home. Instead, he stopped on a grassy hill near the trestle and fell asleep. When he awoke, he was in handcuffs. The defendant admitted to being asleep some twenty-five to fifty feet from the location of Hatmaker's attack but testified that he heard and saw nothing. He admitted that the grid search conducted by police covered the area where he claimed to have been sleeping. He denied running from the bushes. He admitted that he was wearing a white T-shirt and jeans and that he has a harelip. He claimed that when he was taken to the hospital for the victim to identify him, the victim was some seventy-five to one hundred yards away from him.

## ANALYSIS

### I. Out-of-Court Identification

In the trial of this case, no issue was raised questioning whether the assault of Kelly Hatmaker occurred in the early hours of June 15, 1995. The only issue was whether the defendant was the perpetrator. The defendant argues first that evidence concerning the victim's identification of him at the hospital shortly after the attack should have been excluded because the identification procedure violated his constitutional due process rights. Specifically, the defendant asserts that the compelled confrontation at the hospital's emergency room carport was carried out under circumstances, including the fact that he was presented in handcuffs, that unfairly focused the victim's attention on him as the man the police believed to be her attacker.

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive; and (2) gives rise to a "very substantial likelihood of irreparable misidentification."[3] Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). Since "reliability is the linchpin in determining the admissibility of identification testimony," Manson v.

---

[2] During questioning, the defendant was given the date, "July 15, 1995," apparently as the offense date. However, in doing so, the attorney misspoke, and the defendant responded as if the date about which he was being questioned was June 14, 1995.

[3] We note that the phrase "very substantial likelihood of irreparable misidentification" has been applied by courts as the standard for determining admissibility of both in-court identifications and out-of-court identifications in the context of unnecessarily and impermissibly suggestive procedures. The Biggers Court suggested a distinction by the deletion of the word "irreparable" when the question is the admissibility of testimony concerning an out-of-court identification. See Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 381, 34 L. Ed. 2d 401 (1972). While it is theoretically possible that an out-of-court identification could be suppressed but "repaired" by an in-court identification by the same person, Professor LaFave has described such a scenario as "unlikely." Wayne R. LaFave & Jerold H. Isreal, Criminal Procedure § 7.4(c) ( 2d ed. 1992). Whether or not an identification can be repaired by other testimony, both in-court and out-of-court identifications present issues that are analyzed using the same elements.

-4-

Brathwaite, 432 U.S. 116, 114, 97 S. Ct. 2243, 2253, 53 L. Ed. 2d 140 (1977), the central question is "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972) (interior quotations omitted); see also Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").[4]

The factors to be considered in evaluating the reliability of an identification include the following: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.[5] See Biggers, 409 U.S. at 199, 93 S. Ct. at 382. The corrupting effect of the suggestive procedure is weighed against these factors. See Manson, 432 U.S. at 114; see also State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993) ("The degree of reliability of the identification, as indicated by [the Biggers] factors, should be assessed in light of the suggestiveness of the identification procedure . . . .").

The identification procedure carried out in this case, commonly called a "showup,"[6] has long been considered to be "inherently suggestive and unfair to the accused." State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App.), perm. app. denied (Tenn. 1989). For this reason, Tennessee courts have repeatedly condemned the use of showups as a means of establishing the identity of an individual suspected of committing a crime, unless "(a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." Id. (citations omitted). As to imperative circumstances, the United States Supreme Court has identified not only circumstances such as the possible death of the witness/victim, as was the case in Stovall, where a suspect was brought to the hospital room of the knife-attack victim, but also circumstances such as noted in Simmons, including the facts that: "A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to [the suspects]. It was essential for the FBI agents swiftly to determine whether they were on the right track . . . ." Simmons, 390 U.S. at 384-85, 88 S. Ct. at 971.

---

[4]Our supreme court has adopted the "totality of the circumstances" rule for evaluating the reliability of identifications made where suggestive confrontation procedures were employed. See Bennett v. State, 530 S.W.2d 511, 515 (Tenn. 1975).

[5]Our supreme court has adopted the Biggers factors as those that should be considered in evaluating the reliability of an identification. See Rippy v. State, 550 S.W.2d 636, 640 (Tenn. 1977).

[6]A "showup" is a one-on-one confrontation where a single individual is "presented as a suspect to a viewing eyewitness." United States v. Sanders, 547 F.2d 1037, 1040 (8th Cir. 1976), cert. denied, 431 U.S. 956, 97 S. Ct. 2679, 53 L. Ed. 2d 273 (1977).

In this case, the one-on-one showup was inherently suggestive, particularly because the defendant was in handcuffs and pulled from the police car for identification. The practice of presenting a handcuffed suspect in a one-on-one confrontation has been condemned. See, e.g., Webb v. Havener, 549 F.2d 1081 (6th Cir. 1977); State v. Beal, 614 S.W.2d 77, 81-82 (Tenn. Crim. App.), perm. app. denied (Tenn. 1981) (describing such practices as "creating a substantial likelihood of misidentification and are thus to be shunned unless absolutely unavoidable").

We consider next whether the showup was unnecessarily or impermissibly suggestive. Here there was no concern about whether the victim was in a critical state. Officer Trentham was unaware of her condition prior to the showup. On the other hand, a serious felony had been committed. The police had chased and tackled a fleeing suspect who fit the description of the attacker and was found in the very area of the attack. It was important that the police either continue the search, knowing that a violent criminal was still at large, or confirm that they were on the right track with the defendant in custody. The attack had taken place within two to three hours of the confrontation, and the victim was still in the emergency room, so her experience was vivid.

We conclude that the showup in this case was suggestive, but it was not unnecessarily or impermissibly so, given the fact that it was essential for law enforcement officers to determine quickly whether they were on the right track or whether a wider alert and renewed search needed to be undertaken and the showup was in the field shortly after the commission of the crime. Even if we were to conclude to the contrary, that is, that the showup was not only suggestive but unnecessarily and impermissibly so, our analysis would not end there. We would then go on to determine whether, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was unnecessarily and impermissibly suggestive. The Biggers factors would guide this analysis of identification reliability, which we here undertake for the sake of thoroughness.

First, the victim here did have the opportunity to view the defendant at the time of the crime. The victim testified that she first encountered the defendant under street lights. She was in close proximity to the defendant throughout most of the thirty to forty-five minute attack. She faced him directly and intimately during the attack. Second, the victim was not a casual or passing observer but was being subjected to one of the most personally humiliating of all crimes. See Forbes v. State, 559 S.W.2d 318, 322 (Tenn. 1977) (quoting Neil v. Biggers, 409 U.S. 188, 200, 93 S. Ct. 375, 382-83, 34 L. Ed. 2d 401 (1972)). Her attention was focused on the perpetrator. Third, the victim gave a description of her assailant that was accurate in most details. Although the defendant made much of the fact that the victim described his T-shirt as "very light blue" at trial rather than white, such a dissimilarity is inconsequential in view of the overall accuracy of her description, including her attacker's race, clothing, hair color and style, intoxicated condition, and distinguishing facial feature. The description was given shortly after the attack, and, as Officer Trentham testified, the original 911 description, which would have been taken directly from the victim's call, described the T-shirt as white. Fourth, the victim's level of certainty at the confrontation was high. She identified the defendant without hesitation at the hospital, showing, according to Officer Trentham, absolutely no

hesitation. Fifth, the time between the crime and the confrontation, although disputed as to amount[7] was well within a reasonable time frame to support reliability. This court has previously found acceptable a span of seven days between crime and confrontation. See Wadley v. State, 634 S.W.2d 658, 662-63 (Tenn. Crim. App.), perm. app. denied (Tenn. 1982).

We conclude, therefore, that, even if the confrontation were unnecessarily and impermissibly suggestive, our review of the Biggers factors supports our conclusion that, under all the circumstances of this case, there is no substantial likelihood of irreparable misidentification. "Short of that point, such evidence is for the jury to weigh." Manson, 432 U.S. at 116, 97 S. Ct. at 2254. The trial court properly admitted evidence concerning the out-of-court, showup identification of the defendant.

## II. In-Court Identification

The defendant also challenges the admissibility of the victim's in-court identification of the defendant on the grounds that it was tainted by the illegal out-of-court, showup identification procedure. The State argues that there was no illegal out-of-court identification of the defendant by the victim, but, even if there were, the State established that the in-court identification was sufficiently reliable such that its admission as evidence did not constitute a violation of the defendant's due process rights.

According to the above analysis in section I, the showup identification in this case, while suggestive, was not so unnecessarily or impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. Even if the showup procedure had risen to that level, it would not "trigger the application of a per se rule of exclusion." State v. Beal, 614 S.W.2d 77, 82 (Tenn. Crim. App. 1981). Rather, the State may elicit in-court identification testimony if it can establish an "independent basis for the in-court identification." See State v. Thomas, 780 S.W.2d 379, 382 (Tenn. Crim. App.), perm. app. denied (Tenn. 1989). That is, the prosecution must show that the in-court identification testimony has not been tainted by the illegal pretrial identification procedure. See Beal, 614 S.W.2d at 82. The test of reliability is the same as that for testimony concerning an out-of-court showup identification: whether the identification is reliable under the totality of the circumstances, based upon the Biggers factors. See id.

According to the preceding analysis of the Biggers factors, in light of the totality of the circumstances in this case, we find no error in the admission of the victim's in-court identification.[8]

_____

[7]The defendant argues that some four to five hours had passed, while the State argues that no more than two and a half hours passed. The record supports the State's position.

[8]We note, as did the State in its brief, that no contemporaneous objection was made by the defense to the positive, in-court identification made by the victim. According to Tennessee Rules of Appellate Procedure, a party is not entitled to relief who "invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36, Advisory Commission Cmts. We have, nevertheless, chosen to address this issue.
(continued...)

## CONCLUSION

Having chosen to address the defendant's issues on the merits, in spite of clear waiver of both issues, we conclude that testimony concerning the victim's out-of-court identification of the defendant and the victim's in-court identification testimony were sufficiently reliable to withstand the defendant's due process attack, despite the suggestiveness in the identification procedure.

_____
ALAN E. GLENN, JUDGE

---

[8](...continued)