IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2021

**STATE OF TENNESSEE v. DERRIAN HILL**

**Appeal from the Criminal Court for Hamilton County**
**No. 305447    Thomas C. Greenholtz, Judge**

_____

**No. E2020-00721-CCA-R3-CD**

_____

Defendant, Derrian Hill, was indicted with Co-Defendant, Miranda Barley, for aggravated kidnapping in count one and aggravated robbery in count two.[1]  Defendant then filed a Motion to Suppress the victim's pretrial identification of Defendant, and the trial court denied the motion.  Following a trial, the jury convicted Defendant as charged on both counts, and the trial court sentenced Defendant to concurrent terms of eight years' incarceration with a one hundred percent release eligibility for count one and twelve years' incarceration with an eighty-five percent release eligibility for count two.  On appeal, Defendant argues that the trial court erred in denying his Motion to Suppress the victim's pretrial identification of Defendant.  After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Hannah C. Stokes, Chattanooga, Tennessee, for the appellant, Derrian Hill.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

_____
[1] Co-Defendant Barley pled guilty to one count of robbery.

# OPINION

## Factual and Procedural Background

### *Motion to Suppress*

Prior to trial, Defendant filed a Motion to Suppress the pretrial photographic lineup identification of Defendant by Jonathan Middlebrook, the victim, arguing that the lineup was "unduly suggestive."

At the suppression hearing, the victim testified that, on April 27, 2018, at approximately 5:00 a.m., he was robbed by Co-Defendant Barley and Defendant at a hotel on Gunbarrel Drive. He agreed that he then left the hotel on foot and called the police. The victim recalled that Officer Stevenson[2] was the first to arrive. He said that he was in the officer's police vehicle when he directed the officer to Co-Defendant Barley's Facebook pictures. The victim explained that he had seen pictures of Co-Defendant Barley prior to the robbery because they had a mutual friend, Shawana Cooper. The victim said that, while he was in the police vehicle, he had a clear view of the officer's computer screen. He explained that the officer received the room rental agreement from the hotel clerk and that the agreement contained an email address. He said that the officer put the email address into his computer and pulled up Defendant's record. The victim saw Defendant's face on the officer's computer, and the victim said, "[T]hat's him." The victim described Defendant as a tall, skinny, Black man with "dreads" in his hair.

Defense counsel played body camera footage from another investigating officer, and the victim confirmed that the officer in the police vehicle showed the victim a picture of Defendant and asked the victim, "Is that the guy right here?" The victim confirmed that the first time he saw a photograph of Defendant was when the officer pulled up Defendant's criminal history on his computer. He remembered the officer's saying that Defendant had a prior criminal record with a charge similar to robbery. The victim said that he had never seen Defendant before April 27, 2018. The victim stated that, during the attack in the hotel room, the lights were on only over the "kitchenette" and that the encounter only lasted a few seconds.

The victim recalled testifying at the preliminary hearing that the male perpetrator of the robbery put a knife to his neck, but then the victim stated that it could have been scissors. Then he said, "[W]hen I think about it now, it felt like a gun." Defense counsel read part of the victim's testimony from the preliminary hearing, which stated in part,

---

[2] Officer Stevenson's first name does not appear in the record. From the trial transcript, it appears that the victim was actually referring to Officer Jeremy Williams.

"[B]ut I couldn't see what it was, I only felt it. . . .  I just felt a metal object, you know, to the back of my head[.]"  The victim agreed that, during the preliminary hearing, at one point he said that there was a weapon to the side of his neck, and at another point, he said that there was a weapon to the back of his head.  He explained that he did not have a photographic memory of the event.  He said, "I was robbed with something, which I assume was a gun.  Yes, I may have changed my story, but just in hindsight again thinking back[,] that's what I believe it to be."

Another body camera video was played, in which a hotel clerk told officers that the victim told her that he was robbed at a gas station on Gunbarrel Drive.  Following the video, the victim explained that the hotel clerk misunderstood what he told her and that he was robbed at a hotel *near* a gas station.  The victim recalled testifying at Co-Defendant Barley's guilty plea submission hearing that, when he left the hotel after the robbery, he was "completely naked."  He agreed that the hotel clerk described him as wearing a T-shirt and socks.

On cross-examination, the victim stated that he did not wear corrective lenses.  He said that he had not used drugs or alcohol on the morning of the offense.  The victim recalled that he had no difficulty making out the features of the room.  He agreed that he gave a description of the male perpetrator to officers within "a couple hours" of the offense.

On redirect examination, defense counsel played body camera footage of the victim and officers returning to the scene.  Defense counsel noted that the officer had a flashlight.  The victim agreed that, on the video, the hotel room was dark without the flashlight.  The victim stated that the hotel room was "dim" but said that "it wasn't not visible."

On recross-examination, the victim explained that, when the male perpetrator grabbed him, he and the male perpetrator were only an arm's length apart.

Chattanooga Police Department ("CPD") Investigator Giusepe Troncone testified that he met with the victim on the morning of April 27, 2018, at the scene on Gunbarrel Road, approximately one to one- and one-half hours after the victim called 9-1-1.  He said that the victim described the male perpetrator as a Black male, over six feet tall, with "dreads" in his hair, and "skinny."  Investigator Troncone stated that Defendant's ID described him as six feet, one inch tall and 160 pounds.  He said that Defendant wore "dreads" in his hair.  He recalled that he received the receipt from the hotel where the offense took place and noted that the room was let to "Marvin Burum" with the email address listed as hillderrian@gmail.com.  Investigator Troncone testified that, when Defendant was arrested in Tallahassee, Florida, Defendant had possession of the victim's ID.

Investigator Troncone explained that he put together two photographic lineups, one for each co-defendant, consisting of eight photographs each.[3] He said that the lineups occurred at the victim's home approximately five- and one-half hours after the robbery took place. He stated that Investigator Gary Frisbee and Officer Brown[4] showed the photographs to the victim and that Investigator Frisbee and Officer Brown did not know the identity of the suspects when they presented the lineups.

On cross-examination, Investigator Troncone stated that he was present when the lineups occurred but that he was ten to twenty feet away. Investigator Troncone denied that the reason he included Defendant's photograph was because the victim had earlier seen a photograph of Defendant on a computer in the police car. He stated that he included Defendant's photograph in the lineup because of the email address listed on the room agreement from the hotel where the robbery took place and also because he knew that Defendant and Co-Defendant Barley were in a relationship. Investigator Troncone said that he did not include a photograph of Marvin Burum in the lineup because Mr. Burum weighed 260 pounds and did not wear "dreads" in his hair; thus, Mr. Burum did not meet the victim's description.

Investigator Troncone answered questions from the court and stated that the computer generated several photographs of men with an appearance and build similar to Defendant to include in the lineup.

Defense counsel argued that the lineup was "unduly suggestive" because the victim was shown a photograph of Defendant hours before the lineup occurred. Defense counsel argued that the trial court could review all inconsistencies in the victim's story as it changed over time to determine whether the lineup identification was reliable. Defense counsel stated that "[the victim's] overall testimony about things that are based on his memory alone have changed so much throughout the course of this case being pending that it has to be taken into account as to how much he really identified [D]efendant." The trial court stated that showing a victim a single photograph for identification was "clearly condemned," and the prosecutor conceded that a single photograph was "not the preferred method of identification."

The trial court concluded that the initial identification procedure was "impermissibly suggestive." Citing *State v. Thomas*, 780, S.W.2d 379 (Tenn. Crim. App. 1989), the court analyzed factors to determine whether the lineup identification was independently reliable. It stated that the vantage point of the victim during the robbery and

---

[3] The eight photographs from Defendant's lineup were admitted as an exhibit.

[4] Officer Brown's first name does not appear in the record.

- 4 -

his ability to view the male perpetrator "would support a reliable identification." It said that the brief length of time that the victim viewed the male perpetrator did "not weigh strongly in favor of a reliable identification." The trial court determined that the lighting in the room, though dim, was "sufficient for the opportunity to view the suspect to give rise to a reliable identification." It concluded that the victim's "entire focus" was on the perpetrators during the robbery, which weighed in favor of a reliable identification. It stated that the victim's description of the male perpetrator, which he gave to officers on the day of the robbery, was "a little more than being purely generic" and included descriptions of gender, race, height, body type, and distinctive hair. However, it concluded that this factor was not "overwhelming in its weight." While the trial court noted that the victim was "100 percent certain" of his identification, the court stated that this factor, while "it is part of the law and the [c]ourt does follow it, one may reasonably question whether significant weight should be given to it." Finally, the trial court concluded that the length of time between the offense and the lineup was only about five hours, which "certainly support[ed] reliability of identification." The trial court found that the lineup identification was independently reliable, "though perhaps not overwhelmingly so." It noted that there were "fundamental differences between the testimony offered by [the victim] as to various aspects of the alleged offense" that "may reflect on credibility" but concluded that there were no inconsistencies regarding the victim's identification of Defendant as the male perpetrator. The trial court denied the Motion to Suppress.

*Trial*

The victim testified that, on April 27, 2018, he was having a sexual relationship with a woman named Shawana Cooper. He said that he received a Facebook message from someone he thought to be Ms. Cooper to meet him at InTown Suites on Gunbarrel Drive. The victim said that he drove his 2014 Dodge Challenger to the hotel early in the morning. The victim said that, when he arrived, he saw a woman, Co-Defendant Barley, whom he recognized from photos on Ms. Cooper's Facebook profile. He recalled that Co-Defendant Barley was standing alone at the bottom of the stairs and that she led him up to a hotel room. Co-Defendant Barley told the victim that Ms. Cooper was in the shower, so the victim sat on the bed facing the front door. The victim said that the room was dim but that the lights were on in the kitchen. He explained that the male perpetrator "jumped out of the closet and ran up [to him] with a weapon" and that it was "[f]ast enough to catch [him] off guard." The victim said that the male perpetrator had no covering on his face and that the male perpetrator was about three feet away when he came out of the closet. The male perpetrator moved about an "arm's length" from the victim and told the victim that, if he moved, things would "get messy." The male perpetrator tied the victim with a phone cord, put a pillowcase over his head, and put him in the closet. The victim recalled that he felt "metal" against his skin, so he believed the male perpetrator had a weapon. The victim's attackers took his wallet, car keys, Galaxy 8 smartphone, jewelry, and clothes. In the

victim's wallet he had his driver's license, debit and credit cards, insurance, and about forty dollars. The victim recalled that he saw the male perpetrator's face for "a few seconds" before he put the pillowcase on the victim's head. The victim said that he was left wearing only a sleeveless tee shirt and socks.

The victim recalled that it was easy to remove himself from the phone cord restraint and that he ran across the street to Hampton Inn to call police. The Hampton Inn clerk found the victim some shorts to wear and called the police. When the police arrived, the victim took them back to the hotel room at InTown Suites where the robbery took place. After the victim showed the officers the room, he sat in the back of a police car. He recalled seeing a photograph on an officer's laptop and recognized it as the man who robbed him. The victim recalled that, a few hours later, officers came to his home and showed him eight photographs of men and that he selected Defendant as the male perpetrator. He said that he also looked at eight photographs of women and selected Co-Defendant Barley as the female perpetrator.

On cross-examination, the victim agreed that it was 4:00 or 5:00 in the morning when he arrived at the InTown Suites and that it was dark outside. The victim did not recall previously testifying that he and Co-Defendant Barley had "chitchat" about his job. He said that there was not a light in the closet when the male perpetrator came out. The victim said that he did not know for sure if the weapon the male perpetrator used was a knife but "partially" recalled testifying at the preliminary hearing that the male perpetrator put a knife to his throat. He agreed that he previously testified that it was "definitely a blade of something" that was "shiny metal." The victim stated that he had no cuts or bruises after the robbery. The victim recalled that, when he testified at the suppression hearing, he said that he "felt something on the back of [his] head" but could not see if it was a gun or something else. He said, "If it was a lie, it [was] not intentional. Again, I don't know exactly what the weapon was. But again, in hindsight, thinking about it, I personally think it was a gun." He agreed that he did not see the weapon and had "no idea if it was a weapon or what it was."

The victim recalled that he told the police officer that the male perpetrator was wearing dark clothes, but he did not recall at trial what his attackers were wearing. The victim explained that he told the officers how to access Co-Defendant's Facebook pictures from Ms. Cooper's Facebook page. The victim agreed that a police officer pulled up a photograph of Defendant on a computer and asked him, "Is this the guy?" He said that the officer then told him that Defendant had a history of robbery.[5] The victim recalled that,

---

[5] The trial court instructed the jury to disregard the victim's statement about Defendant's prior charges.

within an hour of seeing Defendant's picture on the officer's laptop, he identified Defendant in a photographic lineup.

On redirect examination, the victim said that he told officers that the male perpetrator was a tall, Black, skinny male with "dreads" in his hair. He agreed that Co-Defendant Barley was the one who removed his phone, keys, and wallet from his pockets. The victim agreed that, based on video surveillance footage which he viewed prior to trial, Co-Defendant Barley used his debit card and withdrew money from his account.

Amber Beaudoin testified that she worked at Hampton Inn and Suites at Hamilton Place as a front desk clerk. She said that, in the early morning of April 27, 2018, the victim "showed up at the front door" and was "naked . . . from the bottom down" and asked her to call the police. The victim told Ms. Beaudoin that "he was robbed at a gas station on Gunbarrel." Ms. Beaudoin said the victim was "crying and maybe a little sh[a]ken up." She gave the victim a pair of shorts from the hotel's "lost and found" and called the police. Ms. Beaudoin stated that the police arrived within ten minutes.

On cross-examination, Ms. Beaudoin said that she did not recall the victim saying anything about being at a hotel or about who robbed him. She agreed that she did not observe the robbery.

CPD Officer Jeremy Williams testified that he arrived at Hampton Inn in the early morning of April 27, 2018. Officer Williams recalled that the victim told him that he was robbed at InTown Suites, so he took the victim back to the scene of the incident, which was about half a mile from Hampton Inn. He said that he and other officers inspected the room for a few minutes and that the victim told him the male perpetrator was a Black man wearing a dark shirt and had "dreads" in his hair.

Officer Williams explained that he had a laptop in his police vehicle. Officer Williams said that, while the victim was either sitting in or standing near Officer Williams's car, Officer Williams pulled up a picture of Defendant on his laptop.

On cross-examination, Officer Williams said that, when he first arrived, the victim appeared "sh[a]ken up[,] [s]cared[,] [and p]anicky." Officer Williams agreed that, when Defendant's "mug shot" came up on his laptop, he asked the victim, "Is this the guy?" He did not recall telling the victim that he was familiar with Defendant. He explained that the light in the hotel room where the robbery took place had "medium light" and said that it "wasn't too bright." He observed a cut phone cord near the closet. Officer Williams did not recall seeing a knife or a gun in the room and did not recall any injuries to the victim.

Officer Williams said that showing a victim a single picture of a suspect might be warranted if the incident "just recently happened" and if officers were "trying to catch the suspect and [the victim] was pretty convinced that was him." Officer Williams stated that, because the perpetrators took the victim's car, he was concerned that they might "still be in the area, maybe still dangerous." He said the victim told him that the male perpetrator had a knife.

CPD Investigator Gary Frisbee testified that he conducted the two photographic lineups, one of which included Defendant's photo, and one of which included Co-Defendant Barley's photo. He said that he received the photographs for the lineups from Investigator Troncone. Investigator Frisbee said that he had no idea who the suspects were when he conducted the lineups. He said that the victim selected Defendant and Co-Defendant Barley as the perpetrators.

On cross-examination Investigator Frisbee said that Investigator Troncone was present when he performed the lineups but said that Investigator Troncone remained "back at his car." He said that the lineups occurred in the parking lot in front of the victim's townhouse. Investigator Frisbee said that the victim did not tell him any details about the robbery.

Investigator Troncone testified that he arrived at InTown Suites on Gunbarrel Drive in the early morning of April 27, 2018. He said that, for about ten minutes, he inspected the room where the robbery took place and saw a phone cord on the floor near the closet. He said that the victim described the male perpetrator as a tall, skinny, Black male with "dreads" in his hair.

Investigator Troncone recalled that he received a copy of the room agreement shortly thereafter from a worker at InTown Suites. Based on this room agreement, he developed as suspects Co-Defendant Barley, her family member Marvin Burum, and Defendant. Mr. Burum weighed about 260 pounds, so Investigator Troncone quickly eliminated him as a suspect. Because the email address on the form was linked to Defendant, and because Defendant matched the victim's physical description of the male perpetrator, Defendant became a suspect.

Investigator Troncone put together two separate lineups – one with males and one with females – including both Defendant and Co-Defendant Barley. He said that the computer system generated images of people matching a similar description as a suspect and that he "just pick[ed] seven other people that match[ed] what [Defendant] looked like in his mug shot." Investigator Troncone said that he did not perform the lineups because he knew who the suspects were, so he would have "bias." He explained, "So if I know the suspect is number three, I might not realize I'm doing it, but I might lean into it or just give

something away. So that's why we have somebody who has no idea who [the suspect] is do it." Investigator Troncone said that he was present during the lineups but that he stood ten or twenty feet away. He stated that the victim selected Defendant and Co-Defendant Barley as the perpetrators.

Investigator Troncone recalled that he obtained video surveillance footage from a gas station in which Co-Defendant Barley used a debit card in the store and then again at an ATM machine. He stated that the video also showed a car that was the same year, make, and model as the victim's car outside the store. He agreed that Defendant was not in the video surveillance footage.

On cross-examination, Investigator Troncone said that, when he met the victim about an hour after the 9-1-1 call, the victim was not crying or visibly upset. Investigator Troncone stated that the victim did not have any injuries and that no weapons were recovered from the scene. He recalled that the victim said a "knife or a blade" was placed on his neck. Investigator Troncone agreed that the lineup was "already tainted by Officer Williams showing one picture . . . of just [Defendant]." He said that he was aware that InTown Suites had video surveillance but that he did not attempt to recover the footage to see who had signed for the room rental. Investigator Troncone stated that there was no evidence that Defendant ever used the victim's debit card. He agreed that the victim viewed the male perpetrator for the amount of time it took the perpetrator to take "two or three steps" from the closet to the bed. He said that he did not take any fingerprints from the room.

On redirect examination, Investigator Troncone then said that he considered Officer Williams's showing a single photograph more like a "showup" than a tainted lineup. He explained that, if he arrested someone "within the close proximity" of a scene, he "would just bring them to the scene and identify [them] that way."

Tallahassee Police Department Officer Mike Hubbard testified that, on May 18, 2018, he arrested Defendant and Co-Defendant Barley in Tallahassee, Florida, at a duplex. He said that the victim's bank card and driver's license and the InTown Suites receipt were in the living room area. On cross-examination, Officer Hubbard said that the residence was not registered to either Defendant or Co-Defendant. Officer Hubbard said that the victim's car was in an accident in Florida.

Following deliberations, the jury found Defendant guilty of aggravated kidnapping and aggravated robbery. Following a sentencing hearing, the trial court sentenced Defendant as a Range I standard offender to eight years' incarceration for aggravated kidnapping, to be served with a one hundred percent release eligibility, and to twelve years' incarceration for aggravated robbery, to be served with an eighty-five percent release

eligibility. It ordered the sentences to be served concurrently, for an effective sentence of twelve years with eighty-five percent release eligibility. Defendant filed a Motion for New Trial, which the trial court denied. Defendant now timely appeals.

## Analysis

On appeal, Defendant asserts that the trial court erred in denying his Motion to Suppress. Defendant argues that the "advertising tactic" of showing the victim a single photograph prior to a lineup was impermissibly suggestive. He argues that the identification was unreliable because, during the attack, the victim was "caught off guard" by the male perpetrator jumping from the closet, because the victim only observed the male perpetrator for a few seconds, and because the lighting in the room was dim. Defendant asserts that the victim's changing story about the nature and placement of the weapon -- whether a knife or a gun and whether on his throat or the back of his head -- shows that the victim "does not know what happened that night," that the victim "did not have a good opportunity to observe the assailant[,]" and that the victim was "clearly not able to focus on the details." Defendant argues that the victim's description of the male perpetrator was vague and that, after the officer showed the victim Defendant's photograph in the police car, the officer told the victim about Defendant's prior criminal history, further tainting the identification. He argues that the victim's certainty "must be discounted altogether" because the victim was shown a single photograph prior to the lineup, resulting in "irreparable harm."

The State responds that the trial court correctly found that the victim had sufficient opportunity to view the male perpetrator at close range with adequate lighting. It asserts that the victim paid a "good deal of attention" to his attacker and that the victim provided police with "several pertinent details about his attacker: he was [B]lack, male, over six feet, skinny, with dreadlocks, and wearing dark clothes." The State contends that the victim's description was accurate and not generic. Finally, the State argues that the victim's complete certainty, as well as the brief time between the attack and the lineup identification, support the reliability of the identification.

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. *Id.* We review the trial court's conclusions of law de novo. *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005). In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, this court may consider

the proof adduced both at the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

"Our courts have long recognized the dangers of photographic line-ups." *State v. Billy Murrell Meeks*, No. 01C01-9308-CC-00248, 1994 WL 548714, at \*4 (Tenn. Crim. App. Oct. 6, 1994); *see also Bennett v. State*, 530 S.W.2d 511, 515 (Tenn. 1975) (urging "caution against the use of photographs in general, and a single photograph in particular, immediately preceding a line-up or show-up"). However, "[c]onvictions based on eyewitness identification at trial following a pre[]trial photographic identification will be set aside only if the photographic identification was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *State v. Robinson*, 146 S.W.3d 469, 516 (Tenn. 2004) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "This danger of a misidentification is enhanced if . . . the witness is told that other evidence links a particular person to the crime." *Billy Murrell Meeks*, 1994 WL 548714, at \*4 (citing *Simmons*, 390 U.S. at 384). Although the pretrial photographic identification may be suggestive, the identification may satisfy due process as reliable and admissible when considering the totality of the circumstances. *Robinson*, 146 S.W.3d at 516 (citing *State v. Brown*, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990)). This court considers the following five factors, found in *Neil v. Biggers*, 409 U.S. 188, 199 (1972), in determining whether a suggestive pretrial photographic identification satisfies due process: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the confrontation. *Id.* at 517 (citing *Biggers*, 409 U.S. at 199; *State v. Strickland*, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993)).

Here, the single photographic identification prior to the lineup was inherently suggestive. *State v. Dustin Matthew Lucio*, No. E2014-00642-CCA-R3-CD, 2015 WL 1510830, at \*8 (Tenn. Crim. App. Mar. 31, 2015) ("A police officer's confronting a witness with a single photograph of a suspect is inherently suggestive."), *perm. app. denied* (Tenn. Aug. 13, 2015). Thus, we must review the *Biggers* factors to determine if the identification satisfies due process. *Robinson*, 146 S.W.3d at 516.

The victim said that, when he sat on the bed, the male perpetrator "jumped out of the closet and ran up to [him] with a weapon." He said that the male perpetrator came out of the closet "[f]ast enough to catch [him] off guard." Investigator Troncone stated that, from the closet to the bed, the male perpetrator would have to take "two or three steps." After that point, the victim had a pillowcase over his head and did not see any more of either perpetrator. All of the witnesses agreed that the light in the room was dim and that it was still dark outside. The victim testified that Officer Williams said that Defendant had a history involving criminal activity like robbery. *See Billy Murrell Meeks*, 1994 WL

548714, at *4 (citing *Simmons*, 390 U.S. at 384). These facts weigh against a reliable identification.

Weighing in favor of reliability, the victim testified that he saw the male perpetrator within an arm's length for "[a] few seconds" and said that he "got a good look at him." The victim's description to police of the male perpetrator, which he made prior to both the single photograph identification and the lineup, matched Defendant virtually exactly – that he was a tall, skinny, Black male with "dreads" in his hair. At approximately five hours, the time between the robbery and the lineup was brief, and the victim said that he was "100 percent certain" that Defendant was the male perpetrator.

Moreover, "[a]lthough not specified as a factor in *Biggers,* Tennessee courts routinely consider whether an eyewitness identification is supported by corroborating evidence." *Billy Murrell Meeks*, 1994 WL 548714, at *7 (citing *Bennett*, 530 S.W.2d at 515; *State v. Sanders*, 842 S.W.2d 257 (Tenn. Crim. App. 1992); *State v. Brown*, 795 S.W.2d 689, 694-695 (Tenn. Crim. App. 1990); *State v. Blanks*, 668 S.W.2d 673 (Tenn. Crim. App. 1984); *State v. Mosley*, 667 S.W.2d 767, 770 (Tenn. Crim. App. 1983); *Sloan v. State*, 584 S.W.2d 461, 468 (Tenn. Crim. App. 1978)). Here, Defendant was involved in a relationship with Co-Defendant Barley who pled guilty to the crime, and he was arrested while in Florida with Co-Defendant Barley. Defendant's email was listed on the room rental agreement where the robbery took place. When Defendant and Co-Defendant Barley were arrested in Florida, they were residing together in a Florida duplex where an InTown Suites receipt and several items belonging to the victim were found inside. These corroborating facts lend support to the identification's reliability.

Giving the prevailing party the strongest legitimate view of the evidence, *Odom*, 928 S.W.2d at 23, we conclude that, while the analysis is close, the *Biggers* factors and the presence of corroborating evidence weigh in favor of a reliable identification. *See e.g.*, *State v. Jerry Dobbins and Alonzo Haynes*, No. 86-82-III, 1986 WL 14449, at *3 (Tenn. Crim. App. Dec. 23, 1986) (concluding that, following a suggestive individual "show up" identification, the in-court identification was reliable because, "[a]lthough the lighting was dim at the crime scene, the witnesses were able to clearly see the appellants who were as close as a foot or two from them[,]" because the victim "gave accurate descriptions of the body build and clothing of the assailants, and these descriptions matched the appearance of the appellants when arrested minutes later[,]" because the victim "explained that[,] while she was shocked by the encounter, her attention was focused fully on the man who robbed her, and she was absolutely certain at the show up and in court that the appellants were the robbers[,]" and because only "45 to 50 minutes had elapsed between the robbery and the show up"), *judgment vacated and reinstated on other grounds sub nom. Haynes v. State*, No. 01C01-9110-CC-00313, 1992 WL 186552 (Tenn. Crim. App. Aug. 6, 1992). Thus,

the trial court did not err in denying Defendant's motion to suppress, and he is not entitled to relief.

## **Conclusion**

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE