IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 9, 2000 Session

**STATE OF TENNESSEE v. BOBBY J. HUGHES**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-12787     Joseph Dailey, Judge**

---

**No. W1999-00360-CCA-R3-CD - Filed January 26, 2001**

---

The Defendant, Bobby J. Hughes, was indicted by the Shelby County Grand Jury for the offense of attempted second degree murder. He was subsequently tried by jury and found guilty of attempted second degree murder. In this appeal as of right, the Defendant argues (1) that the evidence was insufficient to support his conviction; (2) that the trial court erred by allowing into evidence four photographs of the victim's wounds; (3) that the trial court erred by allowing the victim to identify the Defendant from a photograph during trial; (4) that the trial court erred by allowing the State to question the Defendant about prior convictions after defense counsel concluded redirect examination; and (5) that the trial court erred by not instructing the jury on attempted voluntary manslaughter. We conclude that the trial court's failure to instruct the jury on the crime of attempted voluntary manslaughter as a lesser-included offense was plain error and was not harmless beyond a reasonable doubt. Accordingly, we reverse the Defendant's conviction and remand the case to the trial court for a new trial.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed and Remanded.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Randall B. Tolley, Memphis, Tennessee, and John P. Pritchard, Memphis, Tennessee, for the appellant, Bobby J. Hughes.

Paul G. Summers, Attorney General and Reporter, Mark E. Davidson, Assistant Attorney General, William L. Gibbons, District Attorney General, and Jennifer Smith Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In November 1997, the Shelby County Grand Jury indicted the Defendant, Bobby Joe Hughes, for one count of attempted second degree murder. The Defendant was tried by jury on October 7, 1998 and found guilty of attempted second degree murder. On December 4, 1998, the

trial court sentenced the Defendant as a Range III persistent offender to twenty-one years in the Tennessee Department of Correction. The Defendant now appeals, presenting the following issues for our review: (1) whether the evidence was sufficient to support his conviction; (2) whether the trial court erred by allowing into evidence four photographs of the victim's wounds; (3) whether the trial court erred by allowing the victim to identify the Defendant from a photograph after he did not recognize the Defendant in court; (4) whether the trial court erred by allowing the State to question the Defendant about prior convictions after defense counsel concluded redirect examination; and (5) whether the trial court erred by not instructing the jury on attempted voluntary manslaughter. We conclude that the trial court's failure to instruct the jury on the crime of attempted voluntary manslaughter as a lesser-included offense was plain error and was not harmless beyond a reasonable doubt. We therefore reverse the judgment of the trial court and remand for a new trial.

The events that gave rise to the Defendant's present conviction occurred on the evening of January 19, 1997. On that evening, the victim in this case, Michael Louis Greer, went to a bar in Memphis called the Filling Station. While there, he encountered Don Petty, a friend whom he had met at the Filling Station and whom he had known for approximately six months. At the end of the evening, Petty asked the victim for a ride "around the corner" to the Defendant's house. The victim testified that he knew the house where Petty wished to go because it was owned by one of his friends, who was renting the house to the Defendant. The victim also testified that he had previously met the Defendant when he stopped by the house with his friend, the owner, to retrieve a fireplace insert from a fireplace inside the home.

The victim transported Petty to the Defendant's house, and when they arrived, the three men sat down in the living room. They each drank a shot of whiskey, and the Defendant and the victim began to play a game of chess. After a brief game, the Defendant won the match, prompting the victim to ask Petty, "[D]o you believe I sat here and got beat by a four-eyed, pot bellied . . . needle dicked[,] goat f__ker?" The victim maintained that he was "just teasing," that the statement was "a joke," and that Petty laughed. What happened next is in dispute.

The victim testified that the Defendant became irate and went into the kitchen. According to the victim, he apologized to Petty for angering the Defendant and stated that he planned to leave. However, while he was talking to Petty in the living room, the Defendant grabbed him from behind and "ran [a] butcher knife across [his] neck about three times." The victim claimed that the Defendant "never said a word" to him, but "just came up behind [him] and started whacking on [him]." The victim emphasized that he never made any aggressive movements toward the Defendant prior to the attack. According to the victim, Petty intervened and "essentially kept [the Defendant] from cutting [the victim's] head off."

The victim's memory of the events which followed was hazy. He explained that his memory had been affected by the traumatic nature of the attack and admitted that he drank a "twelve pack of beer" and one shot of whisky during the eleven hours prior to the incident at issue. However, he remembered fainting in the living room and then taking several steps toward the kitchen before fainting a second time. He proceeded in this manner until he reached the carport, where he fainted

-2-

a final time and where he was later found by police. After law enforcement and medical personnel arrived at the scene, the victim was transported to the Regional Medical Center at Memphis for treatment.

The Defendant presented a different version of the events of the night. He reported that Petty and the victim arrived at his home with a bottle of champagne and a bottle of Wild Turkey. He claimed that the victim was "pretty drunk" when he arrived at the Defendant's home. He denied having consumed any alcohol before Petty and the victim arrived at his house and maintained that he began to drink only when Petty and the victim arrived. The Defendant claimed that when he won the chess game, the victim "went off like a rocket." According to the Defendant, the victim stood up and told the Defendant, "you mother f__ker, you might have beat me at this chess game, but you can't beat me . . . fighting . . . . ," to which the Defendant responded, "you don't talk to me like that in my house . . . ." Petty then attempted to calm the two men, and the victim picked up the champagne bottle and "smack[ed Petty] up against the head." Petty fell onto the couch with "blood pouring down his face." The Defendant testified that he did not know at that time if Petty was dead.

The Defendant testified that the victim then swung the champagne bottle at him, hitting him with the bottle. In response, he jumped across the coffee table and knocked the victim down. The victim got up, and the Defendant began to push him toward the back door. The Defendant testified that because of a serious heart condition, the skirmish exhausted him and caused him to lose his breath. However, he persisted, and the two struggled toward the door. According to the Defendant, he told the victim, "Get your ass out because I'm calling the law on you." The Defendant testified that when they reached the door, the victim turned around, hit him with his fist, and "knocked [him] up against the sink." The Defendant grabbed a knife from the sink. The Defendant again told the victim to "get the hell out of here" and threatened to cut his head off, but the victim "kept reaching back . . . and grabbing [the Defendant's] crotch." The Defendant stated that he cut the victim while struggling to force the victim outside and then "pushed [the victim] right out the door." The Defendant explained that he cut the victim because the victim was acting "crazy" like "a wild maniac," and he was afraid. He also explained that he cut the victim's neck more than once because the victim continued to struggle with him. After the victim was outside the house, the Defendant called 911 and reported, "[A] guy's throat [is] cut in the front of the house [and t]here's a man hurt inside." The Defendant testified that he then went back into the living room to check on Petty while waiting for an ambulance to arrive.

When officers arrived at the scene, they found the victim lying across the back of a car parked in the Defendant's driveway. He was bleeding profusely from his neck. Inside the home, officers found the Defendant and Petty sitting in the living room. Officer Thomas Edwin Avery of the Memphis Police Department testified that Petty had an injury to his head and that he had cuts and blood on his hands. Avery stated that when he arrived at the scene, Petty was extremely intoxicated, belligerent, and uncooperative. He testified that the Defendant was also intoxicated and uncooperative. Upon further investigation, officers discovered a bloody butcher knife on the washing machine. Avery testified that he saw blood in the kitchen sink, on the washing machine, in the kitchen, and outside where the victim was found. The State entered into evidence a

photograph showing a path of blood droplets extending across the Defendant's kitchen floor to a doorway. The officers did not find any blood in the living room or any broken glass in the home. Due to Petty's injuries, Officer Avery initially believed that Petty may have been involved in the incident and therefore arrested him; Petty was later released from custody.

The State introduced into evidence a statement made by the Defendant to police on January 20, 1997. In his statement, the Defendant summarized the events of January 19, 1997 as follows:

From what I recall, [the victim] hit [Petty] and blood started splattering. And I went to the kitchen, and he hit me, and there was a knife, either in the sink or on the counter. And I grabbed it and started at him to keep him off me. And then he went outside and I called the police. . . . [Petty] said we had a little argument over the chess game, but I don't remember what we argued about, because we had all been drinking.

When asked what the victim used to hit him, he replied, "I don't know. He hit me hard. It may have been with his fist."

The State also introduced into evidence photographs of the Defendant's neck wounds made after he had been treated at the hospital. The Defendant testified that he underwent two and a half hours of surgery to repair the wounds inflicted by the Defendant and that he received almost three hundred stitches to his neck. He stated that he spent three days in the hospital following the assault, that he still bore scars from the assault, and that the injuries to his neck still caused him pain.

To offer support for the Defendant's version of the events on the night of the crime, the defense called Don Petty to testify. Petty testified that he had known the Defendant for approximately twenty-five years. He stated that he had known the victim for approximately six months at the time of the crime and reported that he did not know the victim well. With regard to the events on the night of the crime, Petty recalled that on their way to the Defendant's home, he and the victim stopped at a liquor store and purchased "a fifth of 101 and a bottle of champagne." He stated that after they arrived at the Defendant's house, the victim and the Defendant entered into a chess match, which the Defendant won. After the match, the two began to argue. Petty reported that the victim "called [the Defendant] some names" and then challenged the Defendant to fight. Contrary to the victim's testimony that he had no knowledge of how Petty was injured on the night at issue, Petty testified that when he stood up to attempt to quell the dispute, the victim hit him in the head with the champagne bottle, knocking him unconscious. Petty stated that he did not think the bottle broke when it hit him. Petty recalled that when he returned to consciousness, the Defendant told him he thought he had hurt or killed the victim. The police arrived shortly afterwards.

Petty admitted that he consumed quite a bit of alcohol on the January 19, 1997. He recalled that while at the Defendant's house, he, the Defendant, and the victim consumed an entire bottle of whisky, estimating that they had each drunk about four shots each. Petty also testified that he did not remember having any cuts on his hands on the night of the crime, but admitted that he probably told police officers that his hand was cut. He stated that he may have received a cut to his hand

while working and testified that he remembered having blood on his hands from holding his injured head.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first challenges the sufficiency of the evidence used to convict him. In his brief, the Defendant states that

[he] acted in self defense in this matter as supported by the great weight of both the testimony and the forensic evidence in this cause. However, even if the jury did not believe the theory of self defense, there is no evidence in the record that [he] intentionally attempted to knowingly kill [the victim].

He further argues that the State failed to show that the Defendant acted without provocation. The Defendant insists that "the victim's version [of events on the night of the crime] has no corroboration and only contradiction in the record." In support of this contention, he points out that no blood was found in the living room of the Defendant's home, where the victim alleged that the attack took place. He also emphasizes that the victim could not identify the Defendant as his assailant in the courtroom.[1] Furthermore, he stresses inconsistencies between the victim's testimony at the preliminary hearing and his testimony at trial.[2] Finally, he argues that the victim's claim that he did not strike or threaten anyone on the night of the crime is refuted by the injury to Petty's head and testimony by both Petty and the Defendant that the victim struck Petty on the head with a champagne bottle.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956); State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. On the contrary, this Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the

---

[1] See discussion infra concerning the victim's identification of the Defendant from a photograph during trial.

[2] On cross-examination, the victim admitted that although he testified at the preliminary hearing that he had drunk only six beers on January 19, 1997, he had actually drunk twelve beers. He also conceded that he was intoxicated on the night of the crime.

evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Our criminal code defines criminal attempt as follows:
(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101(a), (b).

Second degree murder, the attempted offense in this case, is defined, in pertinent part, as "[a] knowing killing of another." Id. § 39-13-210(a)(1). "Knowing" is defined as follows:

"Knowing" refers to a person who acts knowingly with respect to the conduct or circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result . . . .

Id. § 39-11-106(a)(20).

Having thoroughly reviewed the record in this case, we conclude that the State presented sufficient evidence from which the jury could have found that the Defendant attempted to knowingly kill the victim. The Defendant himself admitted having cut the victim's neck several times with a knife from his kitchen and testified at trial that prior to actually cutting the victim, he threatened to cut off the victim's head. The cuts to the victim's neck were severe, requiring approximately 300 stitches. In addition, Don Petty testified that after he regained consciousness, the Defendant told him that he may have killed the victim. Furthermore, both Petty and the Defendant testified that after the Defendant cut the victim's neck, he made no effort to assist the victim, who lay bleeding profusely in his carport until paramedics arrived at the scene.

The State also presented testimony by the victim that the Defendant, angered by the victim's comment after their chess match, approached the victim from behind while he stood talking to Petty in the living room and sliced the victim's neck without being physically threatened prior to the attack. The victim testified that Petty alone kept the Defendant from "cutting [his] head off." This is ample evidence to support the jury's finding that the Defendant acted with the intent to knowingly kill the victim, believing that cutting the victim's neck would be reasonably certain to cause the victim's death. See id. §§ 39-12-101(a)(2), 39-13-210(a)(1), 39-11-106(a)(20).

Any question as to the Defendant's guilt raised by the evidence, including physical evidence found at the scene, and questions of witness credibility were appropriately presented to the jury for resolution. The jury considered the Defendant's testimony, the victim's testimony, as well as physical evidence found at the scene and apparently concluded that the Defendant's testimony was not credible. Because we may not re-weigh or re-evaluate the evidence, see Matthews, 805 S.W.2d at 779, we will not disturb this finding on appeal. This issue is therefore without merit.

## II. PHOTOGRAPHS OF THE VICTIM'S WOUNDS

The Defendant next argues that the trial court erred by allowing into evidence four photographs of the Defendant's wounds. He contends that the photographs are too graphic and that their prejudicial effect outweighs their probative value. We disagree.[3]

The Tennessee Supreme Court has determined that the admissibility of photographs is a matter within the discretion of the trial court, and a trial court's ruling concerning the admission into evidence of photographs "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "To be admissible, photographs must be relevant to some issue at trial and their probative value must outweigh their undue prejudicial effect, if any." State v. Gann, 733 S.W.2d 113, 115 (Tenn. Crim. App. 1987).

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The photographs in this case depict the wounds to the victim's neck after they had been cleaned and stitched at the hospital. The wounds are severe, and numerous stitches are visible.

---

[3] The State initially argues that this issue is waived because the Defendant objected to the admission of the photographs at trial on a different basis than he asserts in his brief. See Tenn. R. App. P. 36(a). However, the basis of the Defendant's objection to the photographs at trial is somewhat unclear from the record, and we will therefore proceed to address this issue on the merits.

Nevertheless, the wounds are fully closed, and no blood is apparent in the four pictures. The photographs are probative of the nature and extent of the victim's wounds at the time of the attack, and the severity of the wounds, as depicted by the photographs, is probative of the Defendant's intent when he inflicted the injuries. Although the Defendant points out that the trial court allowed the jury to view the victim's scars at trial, we believe that a glimpse of healed scars nearly two years after the wounds were inflicted does little to illustrate the full extent of the wounds at the time of the attack. Because of the strong probative value of the photographs and their limited prejudicial effect, we conclude that the trial court did not abuse its discretion by admitting the photographs at issue into evidence.

### III. IDENTIFICATION OF DEFENDANT FROM PHOTOGRAPH

Third, the Defendant argues that the trial court erred by allowing the victim to identify the Defendant from a photograph at trial. This occurred during direct examination of the victim. When called to the stand, the victim first testified that Don Petty asked him for a ride to "Bobby Joe's house." The victim testified that he knew "Bobby Joe," the Defendant, and the house where the Defendant lived. The State then asked the victim whether he saw the Defendant in the courtroom, to which the victim responded, "No." The victim explained that he had seen the Defendant only twice, once when he went to the Defendant's house with the homeowner to retrieve a fireplace insert and once on the night of the offense now at issue. Later in his testimony, the victim described the Defendant from memory as follows: "He's about five foot nine and had sandy blonde hair, wore glasses, kind of heavy-set."[1]

Following this testimony, the State requested that the victim be allowed to identify the Defendant from a mug shot. The trial court, over the Defendant's objection, allowed the victim to do so, stating,

> [The mug shot] may be a lot closer to how the witness recalls [the Defendant] looking given the fact that the witness testified he had only – that night was only the second time in his life he had seen him, th[a]n the well dressed, well groomed, long sleeve shirt and tie individual that's in court today.
>
> And so to that extent, I think it's appropriate and there is significant enough difference in the appearance to justify allowing [the State] the opportunity to see if this would jog the witness' memory with regard to who it was that assaulted him that night.

This Court has determined that "[w]hen a defendant drastically alters his physical appearance either at the time of the crime or later so as to make his identification more difficult, then it is permissible to permit the witnesses to view the defendant as he looked at the time of the crime if this is practical." Cross v. State, 540 S.W.2d 289, 290 (Tenn. Crim. App. 1976). This Court has also stated that "the admissibility of the identification evidence based on photographs depends on the totality of the circumstances." Id. (citing Bennett v. State, 530 S.W.2d 511 (Tenn. 1975)).

---

[1] The Defendant later testified that he was five feet, nine inches tall.

Initially, we note that although the mug shot that was shown to the victim during trial is included in the record, the Defendant failed to include in the record a photograph of himself at the time of trial. Absent the benefit of a more recent photograph, we are unable to review this aspect of the identification procedure and thus must rely on the trial court's findings with respect to the Defendant's appearance at trial. See Tenn. R. App. P. 13(c). The trial court stated that the Defendant was better groomed and dressed at the time of trial than he was at the time of the crime and concluded that the change in the Defendant's appearance between the time of the crime and the time of trial was significant enough to allow introduction of the mug shot.

We must therefore consider the totality of the circumstances surrounding introduction of the mug shot. The victim testified that he had seen the Defendant only twice, once very briefly prior to the crime and a second time on the night of the crime. Almost two years had elapsed since the time of the crime when the case was brought to trial. However, the victim identified the Defendant by name and stated that he knew where the Defendant lived. He also described the Defendant from memory. Because these facts decrease the danger of misidentification in this case, we believe that the totality of the circumstances support the trial court's decision to allow the victim to identify the Defendant from a photograph.

We further conclude that even if the trial court erred by allowing the victim to identify the Defendant from the photograph, any such error was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). The Defendant's identity as the attacker is not at issue in this case. The Defendant himself admitted that he cut the victim, and both individuals present at the time of the crime, the victim and Don Petty, verified that the Defendant was the person who cut the victim. We thus conclude that the trial court did not err by allowing the victim to identify the Defendant from a photograph at trial.

## IV. PRIOR CONVICTION EVIDENCE

Fourth, the Defendant contends that the trial court erred by allowing the State to question him concerning prior convictions after defense counsel concluded redirect examination. In his brief, he first argues that the trial court erred by allowing the State to recommence questioning after counsel for the defense stated, "No further questions" at the conclusion of redirect examination. He next argues that the prejudicial effect of the prior convictions evidence outweighed their probative value on credibility.

Rule 609 of the Tennessee Rules of Evidence governs "[i]mpeachment by evidence of conviction of crime." It provides as follows:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
>
> (1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction must be established by

public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 609(a)(1)-(3).

In this case, the record indicates that the State provided the defense with written notice of its intent to impeach the Defendant with prior convictions, and the trial court conducted a jury-out hearing prior to the Defendant's testimony to determine the admissibility of the Defendant's prior convictions. At the conclusion of the hearing, the trial court decided that only three of the Defendant's prior convictions could be used for impeachment purposes; these convictions were all felony drug convictions which had occurred within ten years of the commencement of prosecution for the charge now at issue. See Tenn. R. Evid. 609(b). The trial court concluded that the probative value of the convictions on credibility outweighed their unfair prejudicial effect on substantive issues.

The issue of prior convictions arose a second time at trial after redirect examination of the Defendant. During its initial cross-examination of the Defendant, the State did not inquire about any prior convictions, and the defense continued to question the Defendant about the incident at issue on redirect examination, concluding redirect examination by stating, "No further questions." Counsel for the State then informed the court that she "totally forgot to ask questions about the convictions" and requested that she be allowed to question the Defendant regarding prior convictions on re-cross examination. The court ruled, over objection by the defense, that she could do so, stating,

These omitted questions that [counsel for the State] wants to ask are matters that are obviously matters that she intended to ask. We all know that because we had a Morgan hearing not an hour ago.

So it's not as though she just though[t] of this at the last second and is trying to pull some kind of trick on somebody or something.

. . . .

[S]ince [counsel for the defense] stood up on redirect and replowed the same territory regarding the essential facts of this case according to his client, the same credibility questions exist now that existed after cross-examination.

Defense counsel responded that he wished to continue questioning the Defendant, the trial court allowed him to continue his redirect examination, and defense counsel proceeded to question the Defendant about his prior convictions. On re-cross examination, the State also questioned the Defendant about his prior convictions.

## A. Timing of Questioning Concerning Prior Convictions

The Defendant first contends that the trial court erred by allowing the State to "reopen the examination of [the Defendant]" after defense counsel had concluded redirect examination; he complains that the State was allowed to question him about prior convictions after "the proof was closed and the trial was over." We disagree with the Defendant's characterization of the state of the proceedings at the time the State was allowed to question the Defendant regarding his prior convictions. As the trial judge noted, defense counsel "kept the questioning alive" after cross-examination by conducting a redirect examination of the Defendant, thus leaving open the possibility of a re-cross examination. The State merely exercised its option of re-crossing the Defendant after redirect examination. Furthermore, not only was defense counsel aware that the State intended to question the Defendant about prior convictions, but when the trial court ruled that the State could question the Defendant on re-cross examination, defense counsel requested to continue redirect examination in order to first introduce the Defendant's prior convictions to the jury. Defense counsel was allowed to do so despite his previous statement that he had "[n]o further questions" of the Defendant. Finally, we note that the admissibility of testimony and the scope of questions asked of a witness are matters within the trial court's discretion, and this Court may not disturb a decision concerning such matters absent a showing of an abuse of discretion. State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). We find no abuse of discretion on the part of the trial court in allowing the State to impeach the Defendant with prior conviction evidence on re-cross examination.

## B. Probative Value Versus Prejudicial Effect

The Defendant next contends that the probative value of the prior convictions was outweighed by their unfair prejudicial effect. See Tenn. R. Evid. 609(a)(3).

> In determining whether the probative value of a conviction on the issue of credibility
> outweighs its unfair prejudicial effect on the substantive issues, a trial court should
> (a) "assess the similarity between the crime on trial and the crime underlying the
> impeaching conviction" and (b) "analyze the relevance the impeaching conviction
> has to the issue of credibility."

State v. Farmer, 841 S.W.2d 837, 839 (Tenn.Crim. App. 1992) (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9, at 288 (2d ed. 1990)). "The danger of impeaching with [a] similar crime[] is that it may improperly show a propensity to commit that type of crime." State v. Scott Wyatt, No. M199800470CCAR3CD, 1999 WL 1266338, at *3 (Tenn. Crim. App., Nashville, Dec. 29, 1999). Thus, the "true test of similarity is whether the danger of unfair prejudice is great because the crimes are identical or substantially the same." Id. In reviewing the trial court's determination, this Court should not re-evaluate whether the probative value of a prior conviction outweighs its prejudicial effect, but rather, should evaluate whether the trial court abused its

discretion in making the determination. State v. Brian Roberson, No. 01C01-9801-CC-00043, 1998 WL 917804, at *6 (Tenn. Crim. App., Nashville, Dec. 21, 1998) (citing State v. Roberts, 943 S.W.2d 403, 408 (Tenn. Crim. App. 1996)). This Court may not reverse a trial court's determination under Rule 609 absent an abuse of discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

In this case, the impeaching convictions, all involving the sale of controlled substances, are not similar to the crime of attempted second degree murder. Moreover, the impeaching convictions are relevant to the issue of credibility. Rule 609 requires that the impeaching crime be either a felony or a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Not only are the impeaching convictions all felonies, but they all involve the sale of drugs. This Court has determined that a conviction based upon the sale of controlled substances inherently involves dishonesty. See State v. Gibson, 701 S.W.2d 627, 629 (Tenn. Crim. App. 1985) (stating that "[t]he very nature of the act of dealing in drugs is indicative of dishonesty . . . ."). Consequently, the convictions at issue in this case have direct bearing on the Defendant's credibility. We therefore conclude that the trial court did not abuse its discretion in admitting evidence of the Defendant's prior convictions.

## V. JURY INSTRUCTIONS

Finally, the Defendant argues that the trial court erred by failing to instruct the jury on attempted voluntary manslaughter. The Defendant did not request such a charge and did not object at trial to the instructions given to the jury. Questions concerning jury instructions are ordinarily deemed to be waived in the absence of a special request or objection. State v. Cravens, 764 S.W.2d 754, 757 (Tenn. 1989); see also Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988). Moreover, the Defendant has failed to include this issue in his motion for new trial, which ordinarily waives appellate review. See Tenn. R. App. P. 3(e); State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988).

Nevertheless, an appellate court may review an issue which would ordinarily be considered waived if the court finds plain error in the record. Rule 52 of the Tennessee Rules of Criminal Procedure states, "An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(b); see also State v. Adkisson, 899 S.W.2d 626, 636-42 (Tenn. Crim. App. 1994). In an exercise of our discretion, we will address the merits of this issue.

The trial court has a duty to give a complete charge of the law applicable to the facts of a case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). The trial court in this case instructed the jury on the crimes of attempted second degree murder, aggravated assault and assault. In addition, the trial court provided an instruction on self-defense. The Defendant argues that the facts of his case also warranted a jury instruction on attempted voluntary manslaughter.

-12-

In State v. Burns, 6 S.W.3d 453 (Tenn. 1999), the Tennessee Supreme Court adopted the following test for determination of what constitutes a lesser-included offense:

An offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or
(2) a less serious harm or risk of harm to the same person, property or public interest; or
(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. at 466-67.

After a trial court determines that an offense is a lesser-included offense, it must then determine whether a lesser-included offense instruction should be given. The Tennessee Supreme Court has instructed the trial court to undertake the following analysis before making such a determination:

First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469.

In this case, the Defendant was charged with attempted second degree murder.[2] He argues that in addition to the instructions provided, the trial court should have instructed the jury on attempted voluntary manslaughter. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Voluntary manslaughter may be distinguished from other forms of homicide in that it requires a "state of passion produced by adequate provocation." Id.

---

[2] For statutory definitions of second degree murder and criminal attempt, see discussion supra regarding sufficiency of the evidence.

Relying on the test set forth in Burns, we conclude that the crime of attempted voluntary manslaughter is a lesser-included offense of the crime of attempted second degree murder. See Burns, 6 S.W.3d at 466-67. All of its elements are included within the statutory elements of attempted second degree murder, except that "it contains a statutory element or elements establishing . . . a different mental state indicating a lesser kind of culpability." Id. at 467. As the Tennessee Supreme Court has stated, "the 'passion' language in the definition of voluntary manslaughter simply reflects a less culpable mental state than required for first or second degree murder. Therefore, voluntary manslaughter is a lesser-included offense of first and second degree murder." State v. Dominy, 6 S.W.3d 472, 477 n.9 (Tenn. 1999) (citation omitted).

Having determined that attempted voluntary manslaughter is a lesser-included offense in this case, we now proceed to determine whether the trial court erred by failing to instruct the jury on the offense of attempted voluntary manslaughter. In making this determination, we must view the evidence in the light most favorable to the existence of the lesser-included offense. The first inquiry, as outlined in Burns, see 6 S.W.3d at 469, is whether there is evidence in the record supporting the Defendant's contention that he acted in a "state of passion produced by adequate provocation." Tenn. Code Ann. § 39-13-211(a). The Defendant testified that after his chess match with the victim, the victim, who was extremely intoxicated, became belligerent, engaged in name-calling, and challenged the Defendant to fight. The Defendant and Don Petty both testified that the victim hit Petty on the head with a champagne bottle, knocking him unconscious. The Defendant claimed that the victim then swung the champagne bottle at him, and he forced the victim to the floor. A struggle ensued, during which the Defendant managed to push the victim to the back door of his home. According to the Defendant, during the struggle, the victim both grabbed the Defendant's crotch and hit the Defendant with his fist. When the victim continued to struggle with him, the Defendant picked up a butcher knife and cut the victim's neck more than once.

Viewing this evidence liberally, we believe that a jury could have reasonably concluded that the victim provoked the Defendant both before and during their altercation, causing the Defendant to become so enraged that he was "'render[ed] . . . incapable of cool reflection.'" State v. Brown, 836 S.W.2d 530, 543 n.10 (Tenn. 1992) (quoting Winton v. State, 268 S.W. 633, 637 (Tenn. 1925)). We further conclude that this evidence is legally sufficient to support a conviction for attempted voluntary manslaughter. Whether the Defendant's testimony is credible, whether he was actually in a state of passion at the time of the crime, and whether he was *adequately* provoked to cut the victim are all questions of fact for resolution by the jury which we may not consider on appeal. We therefore must conclude that the trial court erred by failing to instruct the jury on the crime of attempted voluntary manslaughter.

Finally, we must determine whether this error by the trial court was harmless beyond a reasonable doubt. See generally State v. Jason Thomas Beeler, No. W1999-01417-CCA-R3-CD, 2000 WL 1670945, at *21-30 (Tenn. Crim. App., Jackson, Nov. 2, 2000). In light of the Burns test pertaining to the issue of lesser-included offenses, see 6 S.W.3d at 466-67, and the hotly disputed evidence in this case as to the actual events leading to the victim's injuries, we conclude that the trial

-14-

court's error in not instructing the jury on the crime of attempted voluntary manslaughter resulted in prejudice to the judicial process in this case and therefore was not harmless.

Because this case is being remanded for a new trial, it is necessary that we review the issue of whether the trial court should have instructed the jury on the offenses of aggravated assault and assault, even though the issue has not been raised on appeal. The indictment in the present case charged only attempted second degree murder; it did not allege counts that charged the Defendant with any form of assault. Thus, the sole basis for the trial court instructing the jury as to aggravated assault and assault is its conclusion that these offenses are lesser-included offenses of the greater offense charged. We disagree. We conclude that the assaultive offenses are not lesser-included offenses of murder or attempted murder.

Prior to Burns, Tennessee appellate courts consistently held that assault was not a lesser-included offense of an attempted murder. See State v. Trusty, 919 S.W.2d 305, 312 (Tenn. 1996), overruled on other grounds, State v. Dominy, 6 S.W.3d 472, 475 (Tenn. 1999); State v. Roscoe L. Graham, No. 02C01-9507-CR-00189, 1999 WL 22853 (Tenn. Crim. App., Jackson, Apr. 20, 1999); State v. Cleo Henderson, No. 02C01-9709-CR-00356, 1999 WL 86987 (Tenn. Crim. App., Jackson, Feb. 23, 1999); State v. Dale Nolan, No. 01C01-9511-CC-00387, 1997 WL 351142 (Tenn. Crim. App., Nashville, June 26, 1997). We believe that Burns compels the same result, and this Court has so held. In State v. Christopher Todd Brown, No. 1999-00691-CCA-R3-CD, 2000 WL 262936 (Tenn. Crim. App., Nashville, Mar. 9, 2000), this Court held that in a prosecution for attempted first degree murder, neither aggravated assault nor assault "meets part (a) of the Burns test [] [n]or does either meet part (b) or part (c) of the Burns test." Id. at *2. Applying the statutory elements analysis that Burns commands, neither aggravated assault nor assault is a lesser-included offense of attempted second degree murder.

We are aware that, prior to Burns, a panel of this Court has indicated that the assaultive offenses may become lesser-included offenses of an attempted murder when a factual premise for assault is stated in the indictment. See State v. Guy William Rush, No. 03C01-9805-CR-00193, 1999 WL 817683 (Tenn. Crim. App., Knoxville, Oct. 13, 1999), perm. app. granted (Tenn., Apr. 24, 2000). In Rush, the indictment charged attempted second degree murder, and on appeal, the defendant posited that reckless aggravated assault, the conviction offense, was not a lesser-included offense of attempted second degree murder. Id. at *4. The court said, "[A] determination of lesser included offenses depends upon the language by which the greater offense is charged in the indictment and can only be made on a case by case basis." Id. at *5(emphasis in original). Because the indictment that charged attempted second degree murder alleged that the defendant "stabbed [the victim] several times," id., the Rush court reasoned that the indictment alleged "serious bodily injury" and, accordingly, included the offense of reckless aggravated assault. Id. at *7; see Tenn. Code Ann. § 39-13-102(a)(2)(A). We are also aware that in the present case, the indictment alleged an attempt to kill the victim through the use of a knife and that the attempt "did cause bodily injury" to the victim. Nevertheless, we conclude that Burns commands a different result from that in Rush, because in Burns our supreme court mandated the use of a statutory elements analysis. Burns, 6 S.W.3d at 466-67. Pursuant to this analysis, descriptive language in a charging instrument *will not*

*create* a lesser-included offense if the statutory elements of the greater offense do not include all of the elements of the lesser offense or otherwise indicate inclusion via parts (b) or (c) of <u>Burns</u>. Accordingly, despite the present indictment stating that the charged offense was committed with a knife and resulted in bodily injury to the victim, it does not and cannot create lesser-included offenses of aggravated assault or assault if, as here, the statutory elements of those offenses put them beyond the pale of lesser-included offenses of the greater offense charged.

Accordingly, we REVERSE the Defendant's conviction and REMAND the case to the trial court for a new trial.

_____
ROBERT W. WEDEMEYER, JUDGE