IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 3, 2002

## STATE OF TENNESSEE v. THERON DAVIS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 00-08557, 58     Chris B. Craft, Judge**

_____

**No. W2002-00446-CCA-R3-CD  - Filed May 28, 2003**

_____

The defendant was convicted by a Shelby County Criminal Court jury of especially aggravated robbery and criminal attempt to commit second degree murder for his role with a codefendant in robbing and shooting the owner of a Memphis jewelry store.  He was sentenced by the trial court to consecutive terms of twenty-three years at 100% for the especially aggravated robbery conviction and twelve years at 30% for the attempted second degree murder conviction.  In a timely appeal to this court, the defendant raises the following four issues: (1) whether the trial court erred by overruling his motion to suppress the victim's identification testimony; (2) whether the trial court erred by denying his request for a special jury instruction; (3) whether the trial court committed plain error in its instruction of the definition of "knowingly"; and (4) whether the trial court erred by ordering consecutive sentencing.  Based on our review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellant, Theron Davis.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and David C. Henry and J. Robert Carter, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The State's proof established the following facts.  Shortly after 10:00 a.m. on December 28, 1999, the defendant, Theron Davis, and a codefendant, Herman Spencer, entered the Summer Avenue jewelry store of the victim, Gary Smallwood, and asked to be shown some diamond rings.

After the victim retrieved the jewelry from the store safe, the defendant pointed a gun at his face and ordered him down onto the floor. The defendant then dumped the contents of a trash can on the victim's head, removed the plastic liner from the can, and began emptying jewelry from the store's display cases into the liner, while Spencer occupied himself in a similar fashion at other display cases using a liner taken from another trash can. At one point during the ten to twelve minutes the victim estimated he spent on the floor during the robbery, the defendant caught him looking at him and ordered, "Don't look at me, bitch."

The victim knew that his store's surveillance camera was broken at the time of the robbery. However, when one of the robbers asked him about the surveillance tape, he told them that he would have to show them where it was, as he could not describe its location. Ordered by the defendant to "get it," the victim stood up and began walking to a back storage room, followed by both robbers. When the victim passed through a doorway, he attempted to slam the door shut behind him, but was prevented from doing so by the robbers, who pushed together against the door. The victim explained that he feared the robbers were going to kill him:

> I was very nervous. I just -- I assumed that they were going to just kill me because I didn't -- I didn't have the tape. And I wasn't going to give it to them if I did have it. And I tried to close the door behind me. And they were pushing back, both of them. And they were hollering. So I -- I ran to the -- to the back area to get out the back door.

As the gun-wielding defendant chased the victim to the back door, the victim heard Spencer screaming, "Kill him. Kill him. Kill him." The victim reached the back exit, threw the wooden security bar up, and opened the door, but the defendant shot him in the back before he could escape. The victim testified he made it out the door, but tripped over some wooden pallets lying on the ground outside. As he struggled to get up, the defendant stood over him and shot him again in the hip. At that point, firefighters from a fire station across the street ran to the victim's assistance, and the defendant and Spencer fled the scene carrying the bags of jewelry. The victim received immediate emergency medical treatment at the scene from one of the firefighters who was also an emergency medical technician, and an ambulance arrived within minutes to transport him to the Regional Medical Center (the "Med"), where he was hospitalized for over a month, including almost one week in the intensive care unit. After his discharge from the hospital, he required the aid of a home health worker for an additional month.

A short time after the robbery, an anonymous "Crimestoppers" tip led police to develop the defendant and Spencer as suspects in the case. Thereafter, Sergeant Investigator Michael Jeffrey Clark of the Memphis Police Department went to the intensive care unit of the Med and showed the victim photographic spreadsheets, from which he positively identified the defendant as the man who shot him and Spencer as his accomplice. Because the victim was on a ventilator at the time and unable to speak, Sergeant Clark worked out a communication system whereby the victim indicated "yes" by raising one finger and "no" by raising two fingers. Sergeant Clark, who had been promoted

to lieutenant by the time of the defendant's suppression hearing, testified at both the suppression hearing and at trial that the victim pointed to the defendant's and Spencer's photographs without any hesitation, and with no prompting from him or anyone else in the room. He acknowledged he asked the victim before showing him the photographs if he understood that he could die from his injuries, and explained he did so because he hoped that, in the event the victim did not survive, any identification the victim made would be admissible as a dying declaration. The victim testified at trial that he had been one hundred percent confident in the identifications he made in the hospital, and he was certain "[b]eyond a shadow of a doubt" that the defendant was the man who shot him.

The defendant and Spencer were later arrested at a motel in Marshall County, Mississippi, and taken to the county jail, where the defendant gave an initial statement to Sergeant Clark denying any involvement in the robbery and offering an alibi, which, upon investigation, failed to check out. Shortly thereafter, the defendant and Spencer waived extradition and were transported back to Tennessee. During the trip, the defendant spontaneously began to confess his role in the robbery, and, after being informed of his rights, told the officers transporting him that he could show them the location of the jewelry. However, when the officers drove the defendant to that location to meet investigators, no jewelry was found. The defendant was then taken to the robbery division headquarters, where he was again advised of his rights and signed a waiver of rights form before giving a detailed, written confession to the crime. In his confession, the defendant said he shot the victim out of panic when the victim attempted to escape, he was sorry he shot the victim, and he never intended to kill the victim.

On July 27, 2000, a Shelby County Grand Jury indicted the defendant and Spencer on one count of especially aggravated robbery and one count of criminal attempt to commit first degree murder. The defendant's separate trial was held before a criminal court jury from October 15-18, 2001.[1] At trial, the State presented the proof which we previously have set out. The defendant testified, denying his involvement in the crimes and saying that the statement he had given confessing his role in the crimes had been coerced by police officers who not only struck him, but also told him that he would be released within six months if he made his account of the crimes match that provided by his codefendant. He said the police officer who took his statement supplied all the words, with the exception of his expression of remorse that the victim had been shot. The defendant insisted he had never robbed anyone and said the police fabricated and forced him to sign the statement because he was a drug dealer and lived a criminal lifestyle. He also offered an alibi, different from the one he had given Sergeant Clark in Mississippi, which was corroborated by Jesse James Brown who testified he and the defendant had been at the defendant's house when the robbery occurred. At the conclusion of the trial, the jury found the defendant guilty of especially aggravated robbery, a Class A felony, and criminal attempt to commit second degree murder, a Class B felony.

---

[1] The record contains the defendant's motion to sever, but no order from the trial court granting the motion. At the sentencing hearing, the trial court made a brief reference to the defendant's pending charge for criminal attempt to commit first degree murder of another victim, involving an incident in which the defendant's codefendant had been killed. It is unclear from the record, however, whether the trial court was referring to Spencer.

The only witness at the defendant's December 7, 2001, sentencing hearing was the victim, who described the intense physical and emotional pain he had suffered as a result of the incident. He said he had undergone numerous surgeries, suffered extreme pain, and been left with extensive permanent physical scarring as a result of his injuries. He was currently still undergoing physical therapy to increase his range of motion from his surgeries. Although he had enjoyed a good business at the Summer Avenue location, where he had operated his jewelry store for over fifteen years, he had been unable, emotionally, to return to work at the same location after the incident and, as a consequence, had been forced to relocate his business. The victim acknowledged his insurance company had reimbursed him for the approximately $200,000 worth of jewelry taken in the robbery, but said that because of the emotional trauma he had experienced from the incident, which left him unable to return to the Summer Avenue location, he had been without any income from his jewelry business until approximately four months before the hearing, when he had finally made the decision to relocate his store.

The trial court found the following four enhancement factors applicable to the defendant's criminal attempt to commit second degree murder conviction: the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; the defendant was a leader in the commission of an offense involving two or more criminal actors; the personal injuries inflicted on the victim were particularly great; and the defendant possessed or used a firearm during the commission of the offense. See Tenn. Code Ann. § 40-35-114(1), (2), (6), (9) (Supp. 2001). The court found two enhancement factors applicable to the especially aggravated robbery conviction: the defendant's previous history of criminal convictions or criminal behavior; and the defendant was a leader in the commission of an offense involving two or more criminal actors. See id. § 40-35-114(1), (2). Finding no applicable mitigating factors for either offense, the trial court sentenced the defendant as a Range I, standard offender to twelve years at 30% for the criminal attempt to commit second degree murder conviction, and as a Range I, violent offender to twenty-three years at 100% for the especially aggravated robbery conviction. Based on its finding that the defendant was a dangerous offender who exhibited little or no regard for human life and no hesitation about committing a crime when the risk to human life was high, see Tenn. Code Ann. § 40-35-115(b)(4), the trial court ordered that the sentences be served consecutively, for an effective sentence of thirty-five years in the Department of Correction.

## ANALYSIS

### I. Identification Testimony

As his first issue, the defendant contends the trial court erred by overruling his motion to suppress the victim's identification testimony. He argues that the totality of the circumstances surrounding the photographic lineup, with the victim in the intensive care unit of the hospital unable to speak and asked by Sergeant Clark if he understood he might die, was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. The State argues that the evidence does not preponderate against the trial court's finding that the circumstances surrounding the identification were not unduly suggestive.

We review the trial court's denial of the defendant's motion to suppress by the following well-established standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the trial court's application of law to the facts, as a matter of law, is reviewed *de novo*, with no presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the rules of appellate procedure "contemplate that allegations of error should be evaluated in light of the entire record," an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

Sergeant Clark testified at the defendant's suppression hearing that, after the defendant was developed as a suspect, he compiled a photographic spreadsheet with the defendant's photograph and showed it to the victim, who was in the intensive care unit of the hospital. He said that when the victim reached the defendant's photograph, which was in position six, the victim immediately tapped his finger on the photograph, positively identifying the defendant without any hints or suggestions from anyone in the room. Sergeant Clark testified the victim indicated that the defendant was the shooter, utilizing a communication system whereby he raised one finger for yes and two fingers for no in response to questions asked him. Sergeant Clark acknowledged that he asked the victim before showing him the photographs if he understood that he was in critical condition and could die, but denied that by doing so, he had been trying to influence him into making an identification. He testified that the victim's inability to identify anyone from the spreadsheets would have simply led him toward eliminating individuals as suspects so that he could then turn his investigation in another direction. At trial, Sergeant Clark identified and read aloud from an "Advice to Witness Viewing Photographic Display" form, which he had read to the victim before showing him the lineup and which stresses that the procedure is "designed to clear the innocent as well as to insure accurate and viable identification of the guilty." That form included the following instruction, which Sergeant Clark testified that he read to the victim before showing the photographs: "No. 3, the person's picture may or may not have anything to do with the subject offense and I am not to assume that the guilty party must be one of the persons represented."

The victim testified at trial that he had immediately recognized the defendant when he saw his photograph and had received no hints or suggestions from Sergeant Clark about which photograph to choose. He acknowledged that he initially told police that he had not seen either man before the robbery, but had remembered several weeks later that both men had been to his store at least twice before the robbery and they had aroused his suspicion on at least one of those prior occasions. He said that he was "[a]bsolutely, [o]ne hundred percent" certain of his identification of the defendant. The victim's business partner, Mike Turbeville, testified at trial that he was present in the hospital room when the victim was shown the photographic lineup, and he witnessed the victim independently choose the defendant's and Spencer's photographs from the spreadsheets without any suggestion from anyone in the room as to which photographs to pick.

In Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Our supreme court has adopted the same standard to be applied by our courts for assessing whether a pretrial identification has violated the due process rights of the defendant, thereby tainting any in-court identification made by the witness. See Bennett v. State, 530 S.W.2d 511, 512-15 (Tenn. 1975). Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Biggers, 409 U.S. at 199, 93 S. Ct. at 382. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Id. (interior quotations omitted). The factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Id. If, however, the court first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification, there is no need to apply the totality of the circumstances test outlined in Biggers. See State v. Leon J. Robins and Tabatha R. White, No. M2001-01862-CCA-R3-CD, 2003 WL 1386835, at *9 (Tenn. Crim. App. Mar. 20, 2003) (citing State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990)).

In its order denying the motion to suppress, the trial court stated:

> This Court has also examined the photospread given in this case, and the facts surrounding the identification process at the hospital, and finds nothing suggestive about the photospread or the process used which might reasonably lead to a misidentification. This Court has considered as well the factors listed in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), as applied to photospreads in *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998), and the testimony at trial of Mike Turberville [sic], who witnessed Lt.

Clark administer the photospread to the victim, and saw the victim indicate the defendant, without suggestion or hesitation.

The record supports the trial court's finding that the photographic identification procedure employed by Sergeant Clark was not impermissibly suggestive. The other individuals shown in the same spreadsheet with the defendant all have similar skin tone, facial features, and hairstyles. Moreover, although the defendant stresses the victim's initial failure to remember his previous encounters with him and Spencer and asserts that "[n]othing is known of the relative certainty expressed by [the victim] about his initial identification of the defendant in his hospital bed," Sergeant Clark, the victim, and a witness, Mike Turbeville, all testified that the victim immediately identified the defendant's photograph without hesitation or prompting or suggestion from anyone in the room. Although the defendant argues that the "gratuitous comments offered by Lieutenant Clark at the time [the victim] viewed the photographic array were calculated to instill a sense of life and death urgency in [the victim]," we would be engaging in rank speculation that the questioned statement resulted in the victim identifying the defendant. Our doing so would infringe upon the trial court's credibility determinations.

Accordingly, we conclude that the record fully supports the trial court's overruling the motion to suppress the identification of the defendant.

## II. Special Jury Instruction

The defendant next contends that the trial court erred by denying his request for a special jury instruction on how to consider the statements he made in the case. The trial court issued the following instruction to the jury:

> The court instructs the jury that if an oral or written statement given by the defendant has been proven in this case, you may take it in consideration with all the other facts and circumstances proven in the case. In considering the statement, it's for you, the jury, to say what weight you will give the statement.
>
> You may believe any part of the statement or disbelieve any part of it, and you may believe the whole statement, or disbelieve it in its entirety.

The instruction the defendant requested instead, which combined elements of the pattern jury instructions on admissions against interest and confessions, reads as follows:

> Evidence of oral and written statements have been introduced in this case. You must consider all the statements made by the defendant, whether favorable or unfavorable to him, and you must not

-7-

disregard any of them without good reason. It is your duty to determine if such statements have been proven.

If you believe a statement was not made by the defendant, you should disregard it. If you decide a statement was made by the defendant, you must judge the truth of the facts stated therein. In so judging, you should consider all the facts and circumstances under which the statement was obtained as well as any evidence which contradicts all or part of the statement made. You may believe any part of the statement or disbelieve any part of it or you may believe the whole statement or disbelieve it in its entirety. It is for you, the jury, to say what weight you will give the statement and you should consider it along with all other evidence in the case in determining the defendant's guilt or innocence.

The defendant asserts the instruction given by the trial court failed to adequately inform the jury that it should consider all his statements, both written and oral, in conjunction with other evidence in determining his guilt or innocence of the offenses, and that it should also take into consideration the circumstances surrounding the making of the statements. He argues that the trial court's instruction "prejudiced [his] right to a fundamentally fair trial" in that he was "deprived of his constitutional right for the jury to consider his alleged statements in their entirety whether made in court or out of court." The State responds that the instruction issued by the trial court contained an accurate statement of the law, and the court did not err in denying the defendant's request for the special jury instruction.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). As long as the instructions given are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). Furthermore, there is no requirement that a trial court be limited to using pattern jury instructions. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

The record reflects that defense counsel initially requested that the trial court charge T.P.I.–Crim. 42.12 (5th ed. 2000), which states in pertinent part that "[e]vidence of a confession has been introduced in this case," it is the jury's duty to judge its truth, and, in so judging, the jury should consider "the circumstances under which the confession was obtained as well as any evidence which contradicts all or part of the statements made," and the jury "must consider all the statements made

-8-

by the defendant, whether favorable or unfavorable to him, and . . . must not disregard any of them without good reason." The trial court refused, concluding that its instruction contained an adequate and accurate statement of the law and expressing concern that labeling the defendant's statement as a confession, as requested by defense counsel, could be considered an impermissible comment on the evidence.

Thereafter, defense counsel submitted the proposed jury instruction quoted above, which combined elements of T.P.I.–Crim. 42.11(a) and 42.12. The trial court refused to charge the special instruction, stating:

> I'm – you know my concern is that there is some substantive law that is not being charged to the jury, then it needs to be charged. But I don't know any substantive law that's not being covered here in the charge that I have without my telling the jury: that there's been this statement put in evidence and you must consider it. That's my concern.
>
> Because I also have another charge that says, "That if you find that a witness's testimony has been impeached, then you – you can consider it untruthful and – and you don't have to consider it.["] So – so that's my concern.
>
> I basically am suppose[d] to let the jury know that they can do whatever they want with the oral statement. They can do whatever they want with the written statement. It's up to them. And I can let y'all argue the inferences that they should consider from the proof. But I think that this charge telling the jury you must consider all the statements made by the defendant whether favorable or unfavorable and must not disregard any of them without good reason, I'm just afraid to comment on the evidence and say whether the statement is good or bad or make the jury think anything like that. So I have this motion for (indiscernible) jury instruction filed, and we're going to make it an exhibit.
>
> . . . .
>
> And I am going to decline the charge.

The trial court's reluctance to give the pattern instruction on confession may have resulted in part from an issue which had been raised in an opinion released by this court a few weeks before the trial. In State v. Thomas L. Jones, No. W2000-01028-CCA-R3-CD, 2001 WL 1117526 (Tenn. Crim. App. Sept. 24, 2001), perm. to appeal denied (Tenn. 2002), the defendant was convicted of second degree murder for shooting his former girlfriend to death. Id. at *1. After his arrest, he gave

a detailed statement to police in which he said he confronted the victim in her bedroom with a gun after breaking into her home, that the victim grabbed for the weapon and was shot three times when the gun repeatedly discharged as they were "tusslin' over it," and that before leaving the house, he returned to her bedroom and shot her twice more after telling himself that he would make sure she was dead. Id. at *2. On appeal, the defendant argued that the trial court's characterization of his statement as a confession in its instruction to the jury constituted an impermissible comment on the evidence, which should have resulted in a mistrial. Id. at *3. We disagreed, concluding that the trial court had correctly noted that evidence of a confession had been introduced and the jury instruction it gave as to a confession contained an accurate statement of the law. Id. In the instant case, the trial court noted that defense attorneys were increasingly challenging the issuance of T.P.I.–Crim. 42.12 as involving an improper comment on the evidence, and thus chose to err on the side of caution by omitting the word confession from its charge to the jury.

We cannot conclude that the trial court erred in refusing to give the special instruction requested by the defendant, or in the instruction which it did charge. The trial court appropriately informed the jury that it was the jury's province to determine what weight, if any, the statements proven in the case should carry. The court additionally informed the jury that it might take any statement in consideration with all the other facts and circumstances proven in the case. We disagree with the defendant's contention that the trial court's instruction deprived him of his constitutional right to have the jury consider all his statements in their entirety, whether made in or out of court. Elsewhere in the instructions, the trial court instructed the jury as to credibility of the witnesses, stating in pertinent part:

> You will take all the evidence produced in the case by the state and the defendant and give it a full, fair and impartial consideration. If there are any conflicts in the statements of the different witnesses, it's your duty to reconcile them, if you can, for the law presumes that every witness has sworn to the truth; but, if you can't, the law makes you the sole and exclusive judges of the credibility of the witnesses and the weight to be given their testimony.

The jurors were additionally instructed that they were the sole judges of the facts and of the law as it applied to the facts in the case. We conclude that the trial court's instructions contained adequate and proper statements of the law, and that the trial court did not err in refusing to submit the special instruction requested by the defendant.

### III. Instruction on "Knowingly"

The defendant next contends that the trial court committed plain error by improperly instructing the jury on the definition of "knowingly." Under the doctrine of plain error, an obvious error that has affected the substantial rights of a defendant may be noticed by this court on appeal, regardless of the defendant's failure to raise the issue at trial or in a motion for new trial, in order to do substantial justice. See Tenn. R. Crim. P. 52(b). In its instructions to the jury on the defendant's

charge of especially aggravated robbery, the trial court issued the standard definition of knowingly contained in Tennessee Code Annotated section 39-11-302(b), stating:

> "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person okays [sic] knowingly with respect to a result of the person's conduct when the person's aware that the conduct is reasonably certain to cause the result.

When instructing the jury on the second indicted offense of criminal attempt to commit first degree murder and its lesser-included offenses, the trial court referred the jury back to its previously issued definition of knowing.

The defendant cites State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), to argue that the trial court's instruction lessened the State's burden of proof for criminal attempt to commit second degree murder because it contained all three definitions of knowingly rather than just the applicable definition for the result-of-conduct offense of second degree murder; namely, the defendant was aware that his conduct was reasonably certain to cause the death of the victim. The defendant also cites Page to argue that especially aggravated robbery is also a result-of-conduct offense, for which the only definition of knowingly that should have been given was that the defendant was aware that his conduct was reasonably certain to deprive the owner of property.

The State responds that neither Page nor any other authority supports the defendant's contention that it was error for the trial court to include all three definitions of knowingly in its instructions on the elements of especially aggravated robbery. With respect to criminal attempt to commit second degree murder, the State argues, *inter alia*, that any error that may have occurred in including all three definitions of knowingly was harmless under Page because the defendant, by claiming he was not involved in the incident at all, did not place his mental state at issue in the case.

The juvenile defendant in Page was tried as an adult and convicted of second degree murder for causing the death of the victim by striking him in the back of the head with a baseball bat. Id. at 782. At trial, the defendant admitted he had swung the bat at the victim, but claimed he did it only to intimidate the victim, had not intended to hit him in the head, and could not believe that he had died. Id. at 785. Defense counsel conceded that the defendant had hit the victim in the head, but argued that the defendant had been intoxicated, was unable to appreciate his conduct, and had no understanding "'of how wrong it was . . . how severe it was at that time.'" Id. On appeal, the defendant argued that the trial court lessened the State's burden of proof by instructing the jury that the knowing element of second degree murder could be established not only by the defendant's awareness that his conduct was reasonably certain to cause the result, but also by the defendant's awareness that his conduct was of a particular nature or that a particular circumstance existed. Id. at 786. We agreed and remanded the case for a new trial with instructions that the trial court instruct the jury that the knowing *mens rea* of second degree murder requires that the defendant acted with

-11-

an awareness that his actions were reasonably certain to cause the death of the alleged victim. Id. at 790.

As the State points out, however, this court also recognized in Page that a trial court's inclusion of all three definitions of knowingly in a homicide case, depending on the circumstances, might well result in harmless error. As we wrote:

> We recognize that in many, if not most, homicide trials, the *mens rea* jury instructions utilized in this case would be harmless error. If a victim is shot at point blank range with a twelve gauge shotgun while asleep, and the defense is the defendant was not the shooter, then the erroneous instruction would likely be harmless. In such a situation, *mens rea* is not a disputed issue at trial. Similarly, if causation is not disputed in a homicide trial, the failure to instruct the jury on causation may well be harmless. See State v. Farner, 66 S.W.3d 188, 206 (Tenn. 2001).

Id. at 789.

The defendant and Jesse Brown testified that, at the time of the robbery, they were together at the defendant's house. Thus, the defendant's mental state was not an issue, for he denied any involvement in the crimes. Accordingly, the error in instructions as to attempted second degree murder was harmless. As to the argument that the trial court erred, as well, in defining the "knowing" *mens rea* of especially aggravated robbery, this court has rejected such a claim as to aggravated robbery, concluding that robbery and aggravated robbery were not result-of-conduct offenses. See State v. Marcus Webb, No. W2002-00614-CCA-R3-CD, 2003 WL 214451, at *4 (Tenn. Crim. App. Jan. 29, 2003). We reach the same conclusion as to especially aggravated robbery and note that the issue in the trial of this matter was not intent, but identity, the defendant denying that he was one of the perpetrators.

## IV. Consecutive Sentencing

As his final issue, the defendant contends that the trial court erred in ordering consecutive sentencing. He argues that the preponderance of the evidence does not support a finding that he is a dangerous offender with little or no regard for human life and no hesitation about committing an offense when the risk to human life is high, or the additional findings necessary to impose consecutive sentencing upon a defendant classified as a dangerous offender, that the aggregate length of the sentences was reasonably related to the severity of the offenses, and that consecutive sentencing was necessary in order to protect the public from further criminal conduct by the defendant. The State argues that the trial court properly imposed consecutive sentencing.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations

made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

As a general rule, a trial court may, in its discretion, impose consecutive sentences based upon a finding that any one of the following statutory criteria are met in a particular case:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person as declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)   The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)   The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)   The defendant is sentenced for an offense committed while on probation; or

(7)   The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (1997).  If the trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, however, it is required to make further findings that the defendant's sentence reasonably relates to the severity of his offenses, and is necessary to protect the public from further criminal conduct of the defendant.  State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In determining whether the defendant's sentences should be consecutive, the trial court considered, but rejected, that the defendant was a professional criminal who had knowingly devoted himself to criminal acts as a major source of his livelihood.  See Tenn. Code Ann. § 40-35-115(b)(1). The court noted the defendant's trial testimony that he was a drug dealer and lived a criminal lifestyle, but concluded that his history of prior convictions was not sufficient to show that he made a living from his criminal lifestyle.  However, the trial court found that consecutive sentencing was warranted under the facts and circumstances of the case based on a finding that the defendant was a dangerous offender.  In so doing, the trial court made the necessary additional findings that the defendant's sentence was reasonably related to the severity of his offenses and necessary to protect the public.  The trial court found as follows:

I do find, though, under 40-35-115 that he is a dangerous offender and whose behavior indicates little or no regard for human life.  And that [the defendant] has no hesitation about committing a crime in which the risk to human life is high. . . . .  And so just on this factor alone, I find that these two sentences should be run consecutively and I base that on the testimony in the trial. [The defendant's] confession where he says, although he says now that his confession was forced, which I find was not forced, when the victim was going to check the tapes because he was ordered by [the

-14-

defendant] to pull the video tape, . . . . And when he went to get the tapes he decided, the victim, that he was going to keep going out the back door. At that point [the defendant] started firing shots at him. And then after he went out the door, according to an independent witness, he saw [the defendant] standing over his body on the ground firing shots into his body. [The defendant] did not hesitate in trying to kill this man even though [the defendant] knew at this point there was no danger to him. He merely wanted to – after this man had gone out the back door, [the defendant] didn't – could not have thought that he was trying to get a gun and go after him. [The defendant] just coldly decided, and I know the jury convicted him of criminal attempt murder second, that it was a knowing killing, there was not sufficient premeditation, but I find that [the defendant] decided that he was going to kill a witness at that point, not to testify against him and he showed no hesitation in trying to kill this man.

In finding that these sentences should be consecutive, I also find in addition to his behavior has indicated no little no disregard – no little or no regard for human life, and that he didn't hesitate about committing a crime which the risk was high to human life. I find that the circumstances surrounding the commission of this offense were aggravated in that there was no reason for this killing. That confinement for an extensive period of time is necessary to protect society. And I say that because in my opinion looking at [the defendant's] record, his drug involvement, the fact that he would attack with other persons, a store like this, in broad daylight with absolutely no hesitation, that this is a dangerous man and needs not to be released into our society.

Now, in doing this, I am not considering at all his pending attempted murder first degree in which his co-defendant was murdered by someone that is still pending in this court. Also, I find that the aggregate length of his sentences, which would be thirty-five years, reasonable [sic] relates to the offenses for which he stands convicted. An armed decent [sic] with other persons in a jewelry store and then the repeated shooting of the victim just to eliminate a witness in my mind definitely deserves a thirty-five year sentence.

From our review of the record, we conclude that the trial court properly imposed consecutive sentencing upon the defendant in this case. The record establishes that the defendant caught the victim looking at him during the robbery and ordered him not to do so. When the victim attempted to escape, Spencer yelled for the defendant to kill him. The defendant pursued the victim to the exit, shot him in the back as he was going out the door, followed him outside, stood over his fallen body,

and shot him again. The defendant fled only after firefighters, alerted by the sound of gunshots, began running to assist the victim. In our view, the circumstances of the defendant's crimes clearly justify the trial court's classification of him as a dangerous offender. Further, these same facts, along with the defendant's prior criminal record and his trial testimony regarding his criminal lifestyle, support the trial court's finding that consecutive sentencing is reasonably related to the severity of the defendant's offenses and is necessary to protect the public from further criminal activity by the defendant.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE